[No. S004656, Crim. No. 24265. Mar. 13, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD DELMER BOYER, Defendant and Appellant.

COUNSEL

Barbara A. Caulfield, under appointment by the Supreme Court, and Steven M. Garrett for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Steven H. Zeigen and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

EAGLESON, J.—Defendant Richard Delmer Boyer was convicted in Orange County Superior Court of two counts of first degree murder (Pen. Code, §§ 187, 189[1]) and two counts of robbery (§ 211). The jury sustained an allegation that defendant had used a deadly weapon, a knife, in each of the offenses (§ 12022, subd. (b)). It also found as special circumstances under the 1978 death penalty statute that defendant had been convicted of more than one murder in the proceeding (§ 190.2, subd. (a)(3)) and that each of the murders was committed intentionally in the course of a robbery (§ 190.2, subd. (a)(17)(i)). After a penalty trial, the jury imposed a death

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

sentence. The trial judge sustained the penalty verdict (§ 190.4, subd. (e)), and a judgment of death was entered. This appeal is automatic.

We confront the relatively rare but distressing case in which the outcome is determined by the constable's blunders. Defendant's inculpatory statement to the police was obtained in flagrant violation of the Fourth Amendment and *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The courts below should therefore have granted defendant's motions to suppress the statement. Its admission at his guilt trial was prejudicial by any applicable standard. We must therefore reverse the judgment in its entirety.

However, we reject defendant's contention that other material evidence of his guilt was also suppressible as "tainted fruit" of the illegal police conduct. This remaining evidence, we conclude, may be admitted in any retrial.

## I. GUILT TRIAL

A. *Prosecution case-in-chief.*

On the evening of December 7, 1982, Francis and Eileen Harbitz, an elderly Fullerton couple, were robbed and stabbed to death in their home. There were no signs of forced entry. The bodies were discovered several days later by the victims' son William, who had become concerned for his parents because they had not responded to his calls and had not been seen.

William testified he knew defendant, who was also acquainted with the victims. On several occasions, defendant helped the elder Harbitzes around the house, and he owed them money. Defendant had been at the senior Harbitzes' home about four months before the killings, and William had not seen or heard from him for a long while thereafter. However, in the week before December 7, William received several telephone calls from defendant. In one conversation, defendant indicated he was struggling to survive financially.

Under a grant of immunity, John Kennedy testified that he and defendant purchased and injected cocaine together on the afternoon of December 7. Kennedy used $25 of his own money to buy the drug. After consuming the cocaine, the two men went to the home of defendant's parents, where defendant was to get money to pay Kennedy back. When he emerged from his parents' residence, defendant claimed he had the money, but he did not immediately give it to Kennedy.

Defendant later indicated he wanted to go to the residence of someone named Bill to collect some money Bill owed him. Kennedy drove defendant to a neighborhood in Fullerton. At defendant's direction, Kennedy parked on a side street, then waited while defendant crossed a yard and disappeared. Defendant was wearing a knife in a sheath. After 45 or 50 minutes, defendant returned carrying a towel. At that moment, a police or security car passed by, and defendant used the towel to wipe off the rear window of Kennedy's vehicle.

Defendant then got into Kennedy's car and told him to drive off calmly without attracting attention. Kennedy noticed a spot of blood on defendant's knife. While they were driving, defendant disclosed he had been stabbed in the leg, and he put the towel over his left knee. Defendant said there had been dope dealers in the house who had no dope and wanted to hurt him, but he had hurt them instead. At defendant's direction, Kennedy proceeded back toward defendant's El Monte residence, using the "605" and San Bernardino freeways. During the trip, defendant went through two wallets. He threw one out the window along the San Bernardino freeway and discarded the other in a sewer ditch beside an offramp in Temple City. Defendant eventually repaid Kennedy for the cocaine.

Cindy Cornwell, also granted immunity for her testimony, disclosed that she and her three children lived with defendant from October 1982 until his arrest. The sole household income was Cornwell's welfare check, and they were in severe economic straits. Cornwell knew defendant had no money on December 7, 1982, because he asked her for $30 that morning. Later that day, he left with Kennedy, saying he wanted to sell a shotgun to his parents to get cash and would be "right back."

Defendant returned home in the evening with a stab wound near his left knee. He said he had been unable to sell the gun to his parents, and had been knifed in an argument with a loan shark whom he next approached. Defendant told Cornwell he had ultimately obtained $10 for the shotgun. He displayed the money, which consisted of two separate bundles of five $1 bills.

On the evening of December 14, defendant told Cornwell he had done something which would make her "mad at him" but gave no further details. Shortly thereafter, Fullerton detectives arrived and asked defendant to accompany them to the station for an interview. Later that evening, after consulting defendant and her attorney, Cornwell gave the police permission to search the residence. Before the police arrived to search, Cornwell burned the light blue jacket defendant had worn on December 7. Cornwell said her motive was to distract defendant when he returned from the police

station by telling him she had burned the jacket but was buying him a new one for Christmas.

Cornwell had seen defendant drunk "many times"; by early December 1982 she was aware he smoked marijuana and used cocaine daily. However, defendant seemed sober when he returned on the night of December 7. Cornwell also indicated that defendant habitually wore a knife on his belt, but had stopped doing so after that day.

During the December 14 search of the home shared by defendant and Cornwell, police found pants stained with blood similar to that of the victims. A bloodstained knife was also seized from the residence. The stains on the knife were of human origin, but were too small to allow closer analysis.

While at the Fullerton police station on December 14, defendant admitted killing the Harbitzes. His recorded interview with Detective Lewis was played for the jury. During the interview, defendant said he had been drinking on December 7 and "was on cola that night, cocaine." He went to his parents to obtain money, but was unsuccessful. He next tried to find William Harbitz for the same purpose, but William had moved from the last address defendant knew. Defendant shared a PCP cigarette with his friend Melody. He then proceeded to the senior Harbitzes' residence, driving a car borrowed from Kennedy.[2] His purpose was to find out where William lived. When he arrived, he "had bennies in [him]" as well as "cocaine . . . and PCP"; he "was definitely on the stuff."

According to defendant's statement, Mrs. Harbitz admitted him cordially. They chatted briefly in the kitchen. Defendant was beginning to feel faint. Mrs. Harbitz encouraged him to say hello to her husband, who was watching television in the bedroom. Defendant did so. While in the bedroom, he noticed Mr. Harbitz's wallet on the dresser. He began to form a "crazy idea" to rob the Harbitzes or obtain money from them somehow.

He emerged from the bedroom, feeling more and more dizzy, and encountered Mrs. Harbitz. As he followed her back down the hall toward the kitchen, he decided to take the couple's wallets and money. At that time, he did not intend to harm them. However, as he placed his hand over Mrs. Harbitz's mouth, he "freaked out" and began to stab her again and again. She broke free and screamed for her husband. Mr. Harbitz came into the hallway and began hitting defendant with his cane. Defendant then "tore

---

[2] In his recorded statement, defendant denied that Kennedy was with him when he went to the Harbitz residence.

into" Mr. Harbitz with the knife. Sometime during the attacks, defendant stabbed himself in the leg but did not realize it at the time.

After the assaults, defendant recounted, he retrieved Mr. Harbitz's wallet from the bedroom dresser.[3] He then rinsed off the knife in the kitchen sink. Mrs. Harbitz's purse was in the kitchen, and he removed her wallet. He took a towel for his leg, left by the front door, and drove away. He removed the cash from the wallets—about $40 in all—and threw them out of the car along the "605" freeway. He also threw the towel away. However, defendant indicated that his bloody jacket, trousers, and knife were still in the house he shared with Cornwell.

Defendant said that just before he grabbed Mrs. Harbitz, he developed a severe headache; then he "started just freakin' out." He was "seeing colors," "flashes" went through his head, and the room "started spinnin'." When Mrs. Harbitz struggled, defendant drew his knife; as he did, he remembered thinking, "I get too involved in, in, violent movies. Okay? And I was thinking of something into that nature at the time. I don't know if I was puttin' myself in, in one of the actor's spots or something. . . ." He remembered only "pieces" of the episode and could not recall where or how many times he had stabbed the victims. He expressed remorse for the killings.

Later on the evening of December 14, after the interview had ended, defendant led detectives to a sewer gutter next to the Temple City offramp from the San Bernardino freeway. There they recovered a wallet linked to the victims.

B. *Defense case.*

Defendant testified in his own behalf as follows: He had been at the Harbitzes' home many times, doing yard and house work. He felt affection for Mr. and Mrs. Harbitz, and he cared about them. He had borrowed money from the Harbitzes in the past, but they were not pressing him for repayment.

Defendant habitually used alcohol, cocaine, marijuana, LSD, Quaaludes, "reds," and "angel dust" (PCP). He consumed a pint of whiskey during the day of December 7, 1982, and may have smoked some "pot." He and Kennedy also "scored" a quarter gram of cocaine, using Kennedy's money. While waiting for Kennedy to obtain the cocaine from Kennedy's "connec-

---

[3] In response to questioning, defendant made clear that the wallet was on the dresser, not in Mr. Harbitz's trousers.

tion" in El Monte, defendant smoked a PCP cigarette. As Kennedy had testified, the two injected the cocaine, then began an odyssey in search of money to repay Kennedy.

During this interval, defendant began to develop a headache he recognized as a reaction to the drugs. He knew from experience that he was "in trouble" and that the symptoms would worsen. His paranoia increased, and his vision began to "play games" with him.

Finally defendant and Kennedy arrived in the senior Harbitzes' neighborhood. Defendant intended to ask William Harbitz's parents where William was now living. Defendant had no intent to harm the elder Harbitzes or obtain money from them. He told Kennedy to drop him off around the corner from the Harbitz residence because his head hurt, Kennedy's "complaining" was making him "paranoid," and he just wanted to get out of the car. After defendant entered the house, his headache intensified, and he felt like someone was hitting him in the back of the head with a hard object. He chatted with Mrs. Harbitz in the kitchen and briefly visited Mr. Harbitz in the bedroom, feeling worse as the minutes passed and wanting only to be on his way.

Defendant politely ended his conversation with Mr. Harbitz, then began to follow Mrs. Harbitz back down the hall toward the front room. As he did so, he saw a foggy figure which looked like a killer in a horror movie, either "Friday the 13th" or "Halloween." He could not make the vision disappear. Defendant felt like he was on a "bad trip" induced by the drugs he had ingested.

At this point, everything "went black." Defendant next recalled kneeling beside Mrs. Harbitz, who was lying on the floor surrounded by blood. Defendant saw Mr. Harbitz and told him to get help. When Mr. Harbitz did not respond, defendant wondered if he was also hurt and went toward him. Defendant again remembered nothing until he found himself in the bathroom, holding a towel and noticing blood on his leg. He blacked out again until he arrived at his car. Contrary to his taped statement, he did not remember taking wallets from the house.

Defendant recalled wiping off the car's rear window with the towel when a police vehicle passed by, but "wasn't really sure" what he needed to conceal. Anxious that "something" had happened inside the house, he told Kennedy to drive away slowly. Defendant then noticed Mr. Harbitz's wallet in his pocket and took the money it contained. He initially intended to throw the wallet out of the car along the freeway, but he ultimately left it in a drainage ditch across the street from his house.

Defendant lied to both Kennedy and Cornwell about the events of the evening of December 7 because he did not know what to say and did not want questions. During the next week, he telephoned both William Harbitz and the senior Harbitzes' residence several times, hoping to learn whether something had happened to them. By the evening of December 14, when Fullerton detectives arrived, defendant was convinced he had probably done something "terrible"; he told Cornwell he thought he had "hurt a couple of people."[4] However, in the taped interview with Detective Lewis, defendant "filled in gaps in his memory," saying he remembered things he actually did not recall. Defendant did so to protect Kennedy and Cornwell. Contrary to his interview statement, he never consciously decided to rob the Harbitzes or obtain money from them, and he had no memory of the stabbings.

The defense also called Dr. Ronald Siegel, a psychopharmacologist. Siegel recited his understanding of defendant's heavy use since adolescence of multiple drugs. According to Siegel, certain of these drugs, particularly LSD, can induce later spontaneous and involuntary "flashbacks," in which the subject relives a prior drug experience. Siegel testified that in a minority of cases—about 7 percent—the subject cannot distinguish the flashback from reality.

Siegel said he had ascertained from defendant's description that defendant's hallucinations in the Harbitz residence were from the movie "Halloween II," which defendant had seen under the influence of PCP, marijuana, and alcohol. The film was played for the jury, and Siegel pointed out various similarities between its scenes and the visions defendant described.

According to Siegel, defendant's report of his feelings at the time of the killings was "consistent with" a momentary flashback to the movie. If such an episode occurred, Siegel suggested, it would have produced confusion, anxiety, impulsiveness, and panic. These feelings would be intensified by the PCP and cocaine defendant had ingested on December 7, 1982, and "may" have caused him to overreact.

Siegel acknowledged that any such flashback was brief, since defendant's conduct beginning immediately after the killings showed rational attempts

[4] This testimony differs both from defendant's police interview and from Cornwell's trial testimony. Defendant and Cornwell have consistently stated that they had a brief, interrupted discussion just before the Fullerton detectives arrived at defendant's El Monte home on December 14. Cornwell claimed at trial that defendant said he had done something she would be "mad" about, but that he gave no further details. Cornwell said she assumed at the time that the transgression was minor. In his statement to the police, on the other hand, defendant declared that he "told her who it was" he had "murdered" and confessed he had "killed . . . Bill's parents." According to defendant's interview statement, his admission to Cornwell "just like took the breath away from her . . . ."

to conceal his guilt. Thus, Siegel conceded, "I don't think [defendant's] intoxication was that intense . . . ."

## C. *Prosecution rebuttal.*

On rebuttal the prosecution introduced a stipulated statement to the following effect: On December 15, 1982, the day after the taped statement, Fullerton Detectives Allred and Lewis again interviewed defendant. At that time, defendant said he remembered stabbing Mr. and Mrs. Harbitz more than once, but he could not say how many times. Defendant also admitted knowing before he left the Harbitzes' home that he had killed them, and he again expressed remorse.

## II. Suppression of Evidence

■■■ At his preliminary hearing, and before both guilt trials in this case,[5] defendant sought suppression of his statement of December 14, 1982, and of other evidence stemming from his station house interview, on grounds they were obtained in violation of his rights under the Fourth and Fifth Amendments and *Miranda* v. *Arizona, supra,* 384 U.S. 436. His motions were denied at all stages. Defendant renews contentions that he was denied his *Miranda* rights, that his statement was involuntary because induced by promises and threats, and that it was the product of an illegal seizure without legal cause.

We find defendant's Fourth Amendment and *Miranda* claims persuasive. The police misconduct leading to defendant's inculpatory statement was aggravated. Though the People characterize his participation as "voluntary," defendant was transported from his El Monte home to the Fullerton police station and interrogated under circumstances amounting to an arrest. This detention was improper under the Fourth Amendment because, as the People concede, the police had no legal ground for the restraint. Defendant's statement was the direct product of the illegal seizure.

Moreover, the interrogating detectives pointedly ignored defendant's unequivocal attempts to assert his *Miranda* rights to silence and counsel. After questioning finally ceased, and without honoring defendant's request for an attorney, one of the detectives began a new conversation about the case under circumstances reasonably calculated to elicit an incriminating response. The ploy was successful; defendant blurted an admission that he was the killer. For each of these reasons independently, defendant's statement was inadmissible at trial as proof of his guilt.

---

[5] A previous guilt trial resulted in a hung jury.

■ The scope of our review of constitutional claims of this nature is well established. We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. (See, e.g., *People* v. *Howard* (1988) 44 Cal.3d 375, 398 [243 Cal.Rptr. 842, 749 P.2d 279]; *In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549]; *People* v. *James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 561 P.2d 1135].) However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. (See, e.g., *People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) Applying these standards, we address the circumstances surrounding defendant's statement.

## A. *Circumstances of interrogation.*

The record, viewed most favorably to the prosecution, indicates as follows: By December 14, 1982, Fullerton police deemed defendant a possible suspect in the Harbitz killings, but they lacked sufficient cause to arrest him.[6] About 5:30 p.m. on December 14, after evening darkness had set in, Detectives Allred and Lewis met at defendant's El Monte residence with Officers Scroggins and Fentress of the El Monte police force. Both sets of officers were in plainclothes and unmarked vehicles. Lewis explained to Scroggins and Fentress that he lacked probable cause to arrest petitioner and was seeking a voluntary interview. He instructed them to "cover the rear" of the house while he and Allred knocked at the front door. It was understood that defendant would be detained if he attempted to flee.

Lewis knocked on the door, identified himself to a woman who peered out the window, asked for defendant, and requested permission to enter. The woman explained the front door could not be opened. Defendant then emerged from the back door and was stopped by Scroggins and Fentress. Scroggins identified himself as a police officer, asked defendant to step into the driveway, and told him two gentlemen in front would like to speak to him. Lewis and defendant testified that the El Monte officers commanded defendant to "freeze" or "halt" when he came out the door.[7]

---

[6] Fullerton Detectives Allred and Lewis acknowledged as much in their testimony at the suppression hearings. Their concession appears well-founded. As of December 14, police suspicions rested principally on the "long shot" suggestion of William Harbitz (himself initially a suspect) that defendant might be the killer because he had done gardening work for the elder Harbitzes, owed them money, often carried a sheath knife, was violent when drunk, and had suddenly begun calling William after being out of touch for several months.

[7] Defendant testified he had heard noises that sounded like dogs barking, went outside to investigate, saw flashlight beams he associated with police officers, and heard someone say "halt" and identify himself as a police officer. Lewis said he heard someone behind the house

The evidence was conflicting as to whether the El Monte officers had "ahold" of defendant as they walked him to the front of the house. There Lewis asked defendant if he would voluntarily come to the Fullerton police station for an interview. Defendant agreed. He testified he did so because he thought he would have to go anyway and did not want to create a scene in front of Cornwell.

Defendant asked if he could go in and get a shirt before leaving with the officers. Lewis agreed, and the officers followed defendant inside. Lewis went into the house because he wanted to keep defendant in sight.[8]

Inside the house, Cindy Cornwell asked if she could accompany defendant to the station. Lewis said she could go, but she was unable to arrange child care. Lewis explained that defendant would be gone about three hours, including one hour of interview time and two hours of travel.

Defendant and the officers then emerged from the house and walked to the Fullerton police car, where defendant was frisked for weapons. Lewis told defendant to "have a seat in back," and defendant did so. Lewis and Allred got into the front seat. There was no cage between the front and rear of the passenger compartment, defendant was not handcuffed, and the car doors were not locked. During the one-hour drive from El Monte to Fullerton, Lewis told defendant they were investigating a homicide and would not take statements until they reached the station.

Once at the Fullerton station, Lewis and Allred brought defendant to a small interrogation room. About 7:15 p.m., Lewis advised defendant of his *Miranda* rights and commenced a tape-recorded interview.[9] Defendant testified he was not aware the conversation was being recorded.

Lewis told defendant the police were investigating the murders of Mr. and Mrs. Harbitz. He then asked some general questions about defendant's relationship to the victims and how recently he had been at their home. Defendant insisted he had not been there for at least six months. After several minutes, Lewis told defendant that William Harbitz "says you killed his mother and dad." As defendant continued to protest his innocence,

---

say, "police officers, freeze." Defendant then came around the corner of the house walking in front of Scroggins and Fentress.

[8] Whether defendant expressly consented to the officers' entry is disputed.

[9] In obtaining defendant's *Miranda* waiver at the outset, Lewis twice asked if defendant, with his rights in mind, was willing to talk to Lewis about the "charges" against him. After the first such question, defendant inquired what charges Lewis was talking about. Lewis then attempted to correct himself, saying "[t]here's, there's no charges at . . . ." Defendant responded, "Oh, okay," and agreed to talk. Lewis then re-asked the question, again using the words "charges against you."

Lewis repeatedly proclaimed that the police knew and could prove defendant had committed the homicides, and that defendant was "gonna fall on this one." Lewis declared that the authorities had evidence of which defendant was unaware, that they could "place [him] at the scene," and that he would discover the nature of the evidence "when [he went] to court." Defendant's lies to the contrary, Lewis asserted, would not make the situation "go away."

Lewis suggested that defendant probably was "wired" (i.e., intoxicated by drugs) when he stabbed the victims and was not fully aware of what he had done. Defendant was urged to show some "damn conscience" and to help the police "understand" his actions. Again and again, Lewis insisted defendant would not be able to "live with" his guilt. Still defendant insisted he had not gone to the Harbitz residence on December 7 and was not the killer.

During this period, defendant asked several times if he was under arrest; Lewis evaded the questions and continued the interrogation. In hopes of prolonging the interview, Lewis also ignored several unequivocal statements by defendant that he wanted a lawyer and did not wish to say anything further. Finally, around 8:49 p.m., defendant again said he "[didn't] wanna talk no more." At this point, Lewis ended the questioning and told defendant to "sit tight."[10]

After leaving the room for a moment, Lewis returned and asked defendant for consent to search the El Monte house. Lewis urged that defendant should have no objection if, as he insisted, he had nothing to hide. Defendant agreed to a search, but only if Cornwell also gave permission, since "[i]t's her house."

---

[10] After twice refusing to answer defendant's inquiry whether he was under arrest, Detective Lewis continued aggressive questioning, finally accusing defendant of "sittin' here lying to me. . . . ' The conversation then proceeded as follows: "[¶] [DEFENDANT]: "So, am I under arrest? I'm under arrest. For murder. (inaudible) charges. [¶] LEWIS: That's where you're at right now. [¶] [DEFENDANT]: Can I have a phone call later? [¶] LEWIS: Uh-huh (yes) [¶] [DEFENDANT]: Well, if I'm under, I wanna lawyer—[¶] LEWIS: I didn't think that a, [¶] [DEFENDANT]: If I'm under arrest, I wanna lawyer. [¶] . . . [¶] . . . I wanna lawyer now if I'm under arrest. [¶] LEWIS: What do you mean, if you're under arrest? You saying you don't want a lawyer if you're not under arrest? That's kinda word games, isn't it? [¶] [DEFENDANT]: Well I, in other words, I don't wanna say no more, you know. Those are my rights, aren't they? [¶] LEWIS: Sure." Nonetheless, Lewis continued the conversation, reemphasizing his theme that defendant would not be able to live with his guilt. Defendant again said, "I'm not sayin' no more. I'm sorry." Again he was ignored. Lewis asked if defendant's girlfriend knew "what you did," and he pursued a line of questioning, ostensibly sympathetic, about defendant's relations with his parents and with the victims. Finally, after an apparent break in the tape, defendant said again, "And I don't wanna talk no more." This time, his request was honored.

After obtaining defendant's consent to search, Lewis again told him to "sit tight for a few minutes" and turned off the recorder. Lewis then telephoned Fullerton Officers Davinroy and Ritter, who had been waiting at a fire station near the El Monte house. He told them they must obtain Cornwell's consent to search the residence. Before doing so, she consulted both defendant (see discussion, *post*) and her attorney. Cornwell subsequently signed a written consent form.

After calling Davinroy and Ritter, Lewis returned to the interrogation room. With the tape recorder still off, Lewis asked defendant if the police could fingerprint him for elimination purposes. According to Lewis, defendant said "okay" but asked again if this meant he was under arrest; Lewis answered that he was not. Defendant recalled no such conversation. Allred then "walk[ed defendant] over to the jail facility" to have his fingerprints taken. Defendant testified he was handcuffed during the trip to the jail; the officers denied it.

After about 25 minutes, Allred returned from the jail with defendant. Defendant took a telephone call from Cornwell. As Lewis interpreted defendant's side of the conversation, Cornwell was asking whether she should give permission to search their residence. Defendant indicated "that it was her decision, it was her house, it was okay with him." Lewis also overheard defendant tell Cornwell he was being charged with two counts of murder. This "somewhat shocked" and "surprised" Lewis, since defendant had not been placed under arrest.

When defendant completed the telephone conversation, he walked toward Lewis, who was standing in the hallway adjacent to the interrogation room. As he did so, Lewis said, "Why don't you step in here [i.e., the interrogation room] for a few minutes, I just want to tell you a couple things." Defendant walked into the room and sat down, while Lewis remained standing at the doorway. The tape machine was not turned on. Lewis recited that since defendant had asked for an attorney, "I wasn't there to solicit any statements from him," but "I just wanted him to understand a couple things."

Lewis then told defendant that while he was being fingerprinted, the detectives had telephoned Paul Harbitz, another of the victims' sons. Paul was "fairly certain" defendant had done yard work for the senior Harbitzes in September or October, more recently than defendant maintained. Lewis advised defendant that he "didn't know whether [defendant] was involved in this" and "whether he was telling the truth or not" but would be "checking further into the case with Bill Harbitz."

According to Lewis, he then turned to leave the room, intending to arrange transportation home for defendant. At this point, defendant shouted, "Hey, wait a minute. Come back here and sit down. You're right, I can't live with it. I did it. I didn't mean to do it. But I did it."

Lewis reactivated the recorder and took a waiver of defendant's *Miranda* rights, during which defendant remarked that he could not afford an attorney. Defendant then proceeded to give the statement described above.

B. *Illegal seizure.*

▮▮ Defendant first urges that his statement must be suppressed because it is the fruit of an illegal arrest without a warrant or probable cause. We agree.

▮ Because of the particular interests protected by the Fourth Amendment, a statement must be suppressed, even when knowing, voluntary, and intelligent, if it is the direct product of an illegal arrest or detention. (*Dunaway* v. *New York* (1979) 442 U.S. 200, 216-217 [60 L.Ed.2d 824, 838-839, 99 S.Ct. 2248]; *Brown* v. *Illinois* (1975) 422 U.S. 590, 602-604 [45 L.Ed.2d 416, 426-428, 95 S.Ct. 2254].) ▮ By proscribing searches and seizures without adequate cause or judicial authorization, the Fourth Amendment guards, among other things, against the police tactic of "investigative detention." (E.g., *Hayes* v. *Florida* (1985) 470 U.S. 811, 815-816 [84 L.Ed.2d 705, 710, 105 S.Ct. 1643].) ▮ This case presents a classic example of such tactics.

The People urge that the encounter between defendant and the police was consensual, and thus not a detention. ▮ However, the test of detention under the Fourth Amendment is whether a reasonable person in the suspect's position would have felt free to leave. (E.g., *Florida* v. *Royer* (1983) 460 U.S. 491, 501-502 [75 L.Ed.2d 229, 239, 103 S.Ct. 1319].) ▮ Under this test, the instant facts suggest conclusively that defendant's interrogation occurred during an illegal, prolonged detention amounting to arrest.

The People stress that defendant was contacted by plainclothes officers in unmarked cars, agreed to go to the police station, was never handcuffed or overtly restrained, and was questioned in an interview room not exclusively reserved for suspects under arrest. They emphasize that the officers never told defendant he was under arrest and had no intent to arrest him until he made the incriminating statement "I did it."

We agree with defendant, however, that many of the formal indicia of detention or arrest were present during the initial encounter with the

officers, his transportation to the Fullerton station, and the ensuing interview. The manner in which the police arrived at defendant's home, accosted him, and secured his "consent" to accompany them suggested they did not intend to take "no" for an answer. Indeed, as previously noted, Lewis testified that the officers intended to detain defendant if he attempted to leave before speaking with them.

Whatever defendant's status before arriving at the Fullerton station, however, the situation quickly ripened into a full-blown arrest inside the station house. Defendant was confronted by two officers in a small interrogation room. He was informed of his *Miranda* rights, an indication that the officers themselves believed the situation might be tantamount to custody. Thereafter, he was subjected to more than an hour of directly accusatory questioning, in which Lewis repeatedly told him—falsely—that the police knew he was the killer, had all the necessary evidence, intended to charge him with the crimes, and would prove his guilt in court. According to Lewis, they sought only to learn "why" he had done it, in order to establish the precise degree of culpability.

While Lewis never expressly told defendant he was under arrest, his response to defendant's pointed inquiries on that issue furthered the impression of official restraint. Lewis first ignored defendant's questions about arrest. Then, in what appeared an immediate answer to another such question, Lewis said, "That's where you're at right now." (See fn. 10, *ante.*)[11] When defendant then asked if he could have a telephone call "later"—an obvious indication that he believed himself in custody—Lewis simply responded, "Uh-huh." (*Ibid.*)

Under such circumstances, a reasonable person could only conclude that the police deemed him their sole suspect in a double murder and would restrain and formally arrest him if he tried to leave. Thus, defendant was under illegal arrest during this period. ▮ The question remains whether his final statement was obtained by exploitation of the illegality and must therefore be suppressed.

▮ The issue is whether "intervening events break the causal connection between the illegal [detention] and the [incriminating statement] so that the [statement] is ' "sufficiently an act of free will to purge the primary taint." ' [Citations.]" (*Taylor* v. *Alabama* (1982) 457 U.S. 687, 690 [73 L.Ed.2d 314, 319, 102 S.Ct. 2664], quoting *Brown, supra,* 422 U.S. at p. 602

---

[11] Lewis testified he intended this comment merely as a continuation of his prior statement to defendant that he believed defendant was lying about his innocence. In context, his remark was not likely to be understood in that way. Even if it were, however, it would constitute yet another ominous evasion of defendant's questions.

[45 L.Ed.2d at p. 426], which in turn quotes *Wong Sun* v. *United States* (1963) 371 U.S. 471, 486 [9 L.Ed.2d 441, 454, 83 S.Ct. 407].) The important considerations are "[t]he temporal proximity of the [illegal seizure] and the [statement], the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." (*Taylor, supra,* at p. 690 [73 L.Ed.2d at p. 690] quoting *Brown, supra,* at pp. 603-604 [45 L.Ed.2d at p. 427].)

 The People suggest that defendant's statement was not the tainted "product" of the illegal arrest, since it occurred as a spontaneous outburst, long after coercive questioning had ceased, and at a time when defendant cannot have believed his liberty was restrained. They emphasize that in the interim between interrogation and statement, defendant consented to "voluntary" fingerprinting, was told he was not under arrest, and was allowed to speak by telephone with his girlfriend. Moreover, the People note, Detective Lewis was preparing to arrange defendant's transportation home when defendant called him back with the words, "I did it."

No such "attenuation" argument was raised below. In any event, we are not persuaded. As the record makes clear, defendant's statement occurred less than four hours after he left his home under police escort, and less than two hours after the commencement of a station house interrogation in which aggressive "softening up" tactics were employed. He remained in police facilities and police company up to the moment he decided to give his statement. Hence, there were no significant intervening events to break the chain of causation between the flagrant illegality of his custodial interrogation and his subsequent statement. (Compare, e.g., *Dunaway, supra,* 442 U.S. at pp. 218-219 [60 L.Ed.2d at pp. 839-840]; *Brown, supra,* 422 U.S. at pp. 603-605 [45 L.Ed.2d at pp. 426-428].)

Were there any remaining doubt, it is resolved by defendant's own words when he first blurted out his involvement in the killings. Defendant's concession that "You're right, I can't live with it" was a direct and obvious response to the interrogational techniques used by Detective Lewis during the earlier illegal interview. Again and again, Lewis had exhorted defendant to confess because he would not be able to "live with" his guilt.[12] Defend-

---

[12] Lewis's variations on the "guilty conscience" theme included the following: "I don't think . . . you can live with it. I don't think you can keep it in your head now that you know what you've done." "You think you can ever face Bill [Harbitz] again? Or Glenda [William Harbitz's wife]?" ". . . And I know you're probably sorry as hell you did it, and you probably can't even believe at this time that you did do it. I think it's like a bad dream to you—you're just trying to wipe it out. But it's not gonna go away." ". . . What. . . I want you to face up to telling me why you did it." "I'll tell you what I think, Rich. I don't think you're gonna be able to live with it. I mean up here. I don't think you can take what you did, you know what I'm saying? Okay?" "Okay, now, listen, up here, is where I don't think you're

ant's "I did it" statement led immediately to his agreement to give a complete statement under a new *Miranda* waiver. ■■■ We could hardly have clearer proof that defendant's entire statement was the product of a will overborne during an illegal detention. For this reason alone, the statement should have been suppressed.

## C. *Miranda*.

■■■■ Defendant asserts that his statement was also inadmissible for the additional reason that his *Miranda* rights were violated in several respects. We concur that defendant's statement was obtained in contravention of *Miranda*. ■■■ ■■ ■■ ■■ ■■ For this independent reason, it should have been excluded from his trial.[13]

---

gonna be able to handle what you did." "I just don't think that you can handle it, psychologically, what you did. Having killed those two people. I don't think you can live with that, Rich. And I think further down the road, you're probably gonna need some help. . . ." ". . . I've been tryin' to find . . . some damn conscience in ya, you know." "Don't you think when someone does something that, you know, especially if it's a, a situation that hurts uh, someone else . . . [t]hat they oughtta be penalized? Don't you believe that?" ". . . Tell me something Rich, you think you're gonna be able to live with it? Up in your head?"

[13] In discussing defendant's *Miranda* arguments, we realize that some question arises whether his trial counsel took all necessary technical steps to save the point for review. As we have noted on several occasions, *in limine* trial court rulings on *nonstatutory* motions to exclude evidence are not binding, since a court must remain free to alter its ruling upon full information at trial. Hence, in general, "when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal. [Citations.] . . . ." (*People* v. *Jennings* (1988) 46 Cal.3d 963, 975 [251 Cal.Rptr. 278, 760 P.2d 475], fn. 3.) Binding pretrial suppression rulings under section 1538.5 are an exception to these principles, but a section 1538.5 motion is limited to evidence obtained by illegal search or seizure; it does not extend to *Miranda* claims. (*People* v. *Campa* (1984) 36 Cal.3d 870, 885 [206 Cal.Rptr. 114, 686 P.2d 634].)

Here, both the section 1538.5 motion and the nonstatutory *Miranda* motion were heard and decided in the superior court *before* the challenged evidence was offered at defendant's *first* trial. For the record, defendant renewed all suppression motions at the second trial. At the conclusion of jury selection at the second trial, but before evidence had been presented, the court ruled without objection that all suppression rulings from the first trial would remain in effect. Thereafter, defense counsel raised no *Miranda* challenge when the prosecution offered the taped statement in evidence.

Nonetheless, we find the *Miranda* issue properly before us on the particular facts. Even if the parties' acceptance of the "continued effect" ruling did not amount to a "stipulation" on that point (see *Jennings, supra,* 46 Cal.3d at pp. 975-976, & fns. 3, 4), any renewed objection would have been entirely futile. The sole issue litigated in the binding pretrial motion under section 1538.5 was whether defendant was being "detained" by the police for Fourth Amendment purposes at the time he made his statement. (The People conceded that the police had neither a warrant nor legal cause to detain him, and they did not argue that the statement was somehow "attenuated" from any illegal detention.) As both counsel acknowledged in their later arguments on the nonstatutory *Miranda* motion, this "no detention" finding essentially obviated *Miranda*'s application, since the requirements of that case extend only to "cus-

■ The prophylactic requirements of *Miranda, supra,* are familiar. In order to assure protection of the Fifth Amendment right against self-incrimination under "inherently coercive" circumstances, a suspect may not be subjected to an interrogation in official "custody" unless he has previously been advised of, and has knowingly and intelligently waived, his rights to silence, to the presence of an attorney, and to appointed counsel if he is indigent. Even if the suspect initially waives these rights and responds to interrogation, he may reinvoke them at any time. If he does so "in any manner and at any stage of the process," his request to terminate the questioning or obtain counsel must be "scrupulously honored." (384 U.S. at pp. 444-445, 473-474, 479 [16 L.Ed.2d at pp. 706-707, 723, 726-727].) Statements obtained in violation of *Miranda* are not admissible to establish his guilt.

■ Here, defendant was read his *Miranda* rights before the station house interview began, and he waived them. However, defendant notes that his interrogator, Detective Lewis, later evaded inquiries about his custodial status, then refused to end the interview immediately when defendant asserted his rights to silence and an attorney. Once questioning was suspended, defendant urges, Lewis erred further by engaging him in a new conversation which was reasonably likely to, and did, elicit an incriminating response. Finally, defendant points to his subsequent remark, after a new *Miranda* waiver was taken, that he could not "fuckin' afford an attorney." This comment, he urges, shows that he misunderstood his right to free appointed counsel. Thus, defendant argues, any waiver of rights he made before giving his statement was not knowing and intelligent.

■ *Miranda* applies to questioning under the coercive conditions of official "custody." (384 U.S. at p. 444 [16 L.Ed.2d at p. 706]; see also p. 467 [16 L.Ed.2d at pp. 719-720].) ■ "Custody" means "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California* v. *Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279-1280, 103 S.Ct. 3517]; *Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711]; *Green* v. *Superior Court* (1985) 40 Cal.3d 126, 133-136 [219 Cal.Rptr. 186, 707 P.2d 248]; see also *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 439-440 [82 L.Ed.2d 317, 334-335, 104 S.Ct. 3138].) ■ The People first urge that since defendant consented to accompany the officers for questioning, and was not under formal arrest, he was not in "custody" when he made his incriminating statements.

todial" interrogation; the *Miranda* test of "custody" is even more stringent than the Fourth Amendment test of "detention." (See text discussion, *post.*)

Under these circumstances, counsel cannot be faulted for failing to renew his *Miranda* challenge at the moment defendant's statement was offered in evidence. No rational interest is served by a conclusion that *Miranda* arguments were waived.

The contention lacks merit. ▮▮▮ Where no formal arrest takes place, the relevant inquiry, as with Fourth Amendment claims, "is how a reasonable man in the suspect's position would have understood his situation. [Fn. omitted.] . . ." (*Berkemer, supra,* 468 U.S. at p. 442 [82 L.Ed.2d at p. 336]; *Green, supra,* 40 Cal.3d at p. 135, fn. 5.)

▮▮▮ ▮▮▮ In deciding the custody issue, the totality of circumstances is relevant, and no one factor is dispositive. (E.g., *California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275, 1279, 103 S.Ct. 3517].) However, the most important considerations include (1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of questioning. (*People v. Celaya* (1987) 191 Cal.App.3d 665, 672 [236 Cal.Rptr. 489]; *People v. Blouin* (1978) 80 Cal.App.3d 269, 283 [145 Cal.Rptr. 701]; *People v. Herdan* (1974) 42 Cal.App.3d 300, 306-307 [116 Cal.Rptr. 641].) ▮▮▮ As the People note, of course, *Miranda* is not invoked simply because questioning is conducted at a police station, even where suspicion has "focused" on the subject. (E.g., *Beheler, supra,* 463 U.S. at pp. 1124-1125 [77 L.Ed.2d at p. 1279]; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711].)

▮▮▮ Nonetheless, the People's assertion that defendant was not in "custody" for *Miranda* purposes is foreclosed by our prior finding that defendant's interrogation occurred during an illegal detention tantamount to arrest. As noted, the police read defendant his *Miranda* rights at the station, a strong indication that they themselves considered the interrogation "custodial." Moreover, in an intense interrogation spanning nearly two hours, they *led defendant to believe* that suspicion had focused on him, that they considered him guilty, and that they had the evidence to prove his guilt in court. As we have previously noted, a reasonable person in such circumstances would only have considered himself under practical arrest. The interrogation was therefore "custodial," and the *Miranda* safeguards applied.

▮▮▮ Assuming defendant was in "custody," the People acknowledge Lewis clearly violated *Miranda* when he ignored several explicit requests by defendant to remain silent and consult a lawyer. However, questioning did cease before defendant made any statement urged by either party as incriminating. The People thus contend that defendant's subsequent inculpatory statements were not obtained in violation of *Miranda,* since they came only after he spontaneously reinitiated contact with the police, then voluntarily, knowingly, and intelligently rewaived his *Miranda* rights. (See *Michigan v. Jackson* (1986) 475 U.S. 625, 626 [89 L.Ed.2d 631, 636, 106 S.Ct. 1404]; *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1041-1046 [77 L.Ed.2d 405, 409-

413, 103 S.Ct. 2830] [plur. opn. of Rehnquist, J.], 1052 [77 L.Ed. at pp. 416-417] [dis. opn. of Marshall, J.]; *Edwards* v. *Arizona* (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386, 101 S.Ct. 1880]; *People* v. *McClary* (1977) 20 Cal.3d 218, 226 [142 Cal.Rptr. 163, 571 P.2d 620].)

We disagree. ██ Once the suspect has "expressed his desire to deal with the police only through counsel, [he] is *not subject to further interrogation by the authorities* until counsel has been made available to him, *unless the accused himself* initiates further communication, exchanges, or conversations with the police." (*Edwards, supra,* 451 U.S. at pp. 484-485 [68 L.Ed.2d at p. 386], italics added.) Once the *Miranda* right to counsel has been invoked, no valid waiver of the right to silence and counsel may be found absent the "*necessary fact* that the accused, not the police, reopened the dialogue with the authorities." (*Id.,* at p. 486, fn. 9 [68 L.Ed.2d at p. 387], italics added; see also *Bradshaw, supra,* 462 U.S. at pp. 1044-1045 [77 L.Ed.2d at pp. 411-412] [plur. opn.], 1052-1053 [77 L.Ed.2d at p. 417] [dis. opn. of Marshall, J.].)[14]

██ Moreover, forbidden renewed "interrogation" includes both direct questioning and its "functional equivalent." "That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely [from the suspect's perspective] to elicit an incriminating response from the suspect. . . ." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682], fns. omitted.)

██ Defendant had been subjected to over an hour of intensive interrogation, during which the police repeatedly accused him of lying and pro-

[14] Arguable differences exist between California and federal law about whether the police may reapproach a suspect in custody once questioning has ceased following an invocation of *Miranda* rights. In *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108], we declared, contrary to *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321], that the police may *never* reinitiate custodial questioning of a person who has asserted his rights to silence *or* counsel. The United States Supreme Court has since held that one who invoked his right to *counsel* under *Miranda* may not be subjected to new attempts at interrogation until a lawyer has been obtained. (*Edwards, supra,* 451 U.S. at pp. 484-485 [68 L.Ed.2d at p. 386].) The more flexible rule of *Mosley,* which may allow renewed questioning after the suspect is afforded time for reflection, is apparently still in effect when the suspect simply asserted his right to *silence.* Here, a fair reading of the record indicates that defendant asserted *both* rights, and the People do not contend otherwise. Hence, both state and federal law suggest the police could not attempt to question him anew. Accordingly we need not determine whether exclusionary rules stemming solely from *Pettingill* survive Proposition 8. (But see *People* v. *May* (1988) 44 Cal.3d 309, 315-320 [243 Cal.Rptr. 369, 748 P.2d 307]; *People* v. *Warner* (1988) 203 Cal.App.3d 1122, 1126-1129 [250 Cal.Rptr. 462].)

fessed their firm belief in his guilt. He vehemently maintained his innocence and finally invoked his *Miranda* rights to silence and counsel. For a significant time, his pleas were ignored, and the questioning continued over his objection.

When interrogation finally ceased, and while he was still in the coercive environment of custody, defendant was taken for "voluntary" fingerprinting. He was then returned to the interrogation area. He was allowed a telephone call to Cornwell, during which Detective Lewis overheard him express his belief that he was being charged with murder. There is no evidence that defendant sought to discuss the case further with the authorities during this period.

*Lewis* then asked defendant to reenter the interrogation room so that *Lewis* could "tell him a couple of things." No attorney was present on defendant's behalf. After carefully admonishing defendant that he could not be questioned further in light of his invocation of *Miranda* rights, *Lewis* nonetheless launched into a monologue on the status of the investigation. He told defendant that a newly contacted witness *disputed defendant's claim* as to the last time defendant had visited the victims' residence. Lewis then advised, in effect, that defendant was still under suspicion and that investigation of his involvement would continue. As Lewis turned away, defendant's will buckled. He called Lewis back and blurted, "I did it."

We therefore conclude, under *Edwards* and *Innis,* that defendant's statement was the result of the authorities' improper resumption of contact and questioning. The *Edwards* rule renders a statement invalid if the authorities initiate *any* "communication, exchanges, or conversations" relating to the case, other than those routinely necessary for custodial purposes. (*Edwards, supra,* 451 U.S. at pp. 484-485 [68 L.Ed.2d at p. 386]; see *Bradshaw, supra,* 462 U.S. at p. 1045 [77 L.Ed.2d at p. 412] [plur. opn.].) The record discloses no custodial reason why, once defendant had invoked his *Miranda* right to counsel, it was necessary to approach him again to "tell him a couple of things" about the investigation. On this basis alone, we must find that defendant's statement contravened the requirements of *Miranda*.

But Detective Lewis did more. His aggressive, prolonged interrogation earlier in the evening was calculated to convince defendant that the police believed him a guilty liar. As Lewis knew, the technique had hit home; Lewis overheard defendant tell Cornwell he believed he would be charged with homicide. Though defendant may finally have been advised he was not under arrest, neither had he been released. The pressures to confess, or to appear innocently cooperative, were thus very strong. ▪▪▪▪ ▪ Under these circumstances, by confronting defendant once again with

a discrepancy in his story, Lewis effectively invited defendant to make an "incriminating response" in violation of *Innis*.[15]

■ The People's assertion that Lewis's remarks were neither "designed" nor "reasonably likely" to elicit a damaging reply is unpersuasive. As *Innis* ruled, the determination whether police words or actions were "reasonably likely" to elicit an incriminating response "focuses primarily upon the perceptions of the subject, rather than the intent of the police." The *Miranda* safeguards, *Innis* declared, were intended to "vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. . . ." (446 U.S. at p. 301 [64 L.Ed.2d at p. 308].) Even if Lewis had no conscious purpose to entice defendant into further discussion (though we can discern no other), he should have realized under all the circumstances that this was a likely result.

■ The People suggest that because Lewis gave no opportunity for response, and had ended the encounter by turning away, *defendant* must be deemed to have "initiated" a new conversation by calling Lewis back. Our concurrence in that view would violate the spirit of *Edwards*. It would allow circumvention of the prophylactic rule against new *approaches* by the authorities once the suspect has invoked his *Miranda* right to counsel.[16]
■ We decline the People's invitation to characterize the facts as they suggest. Defendant's statement was obtained in violation of *Miranda* and its progeny. His motion to suppress his statement on that ground should have been granted.[17]

---

[15] *Innis* made clear that "[b]y 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda*, [¶] '. . . [s]tatements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word . . . .' [Citation.]" (446 U.S. at p. 301, fn. 5 [64 L.Ed.2d at p. 308], italics in original.) Nor was the coercive potential of Lewis's conduct so "subtle" that it cannot be deemed the "functional equivalent" of forbidden questioning. (Compare *Innis, supra,* 446 U.S. at pp. 302-303 [64 L.Ed.2d at p. 309] [while transporting shotgun-murder suspect immediately after arrest, officers briefly remarked *to each other* that it would be unfortunate if a child found the missing weapon and was injured; no reason officers should reasonably have expected suspect to respond with offer to lead police to the weapon].)

[16] Turning away from the suspect under these conditions does not necessarily signal that the interrogator is sincerely precluding a response. Indeed, such a gesture can be an effective means of telling a custodial suspect who is anxious to seem credible that "since you have invoked your right to silence and counsel, and have refused to cooperate, I wash my hands of you." Moreover, though Lewis testified that his purpose in turning away was to arrange defendant's transportation home, nothing in the record indicates this intent was disclosed to defendant.

[17] Our analysis makes it unnecessary to determine whether defendant's subsequent rewaiver of *Miranda* rights was invalid on grounds his statement that he could not "fuckin' afford

## D. *Tainted fruit.*

Defendant urges that the testimony of John Kennedy, the wallet, and the evidence recovered in the search of defendant's residence were direct products of the illegal police conduct and thus should also have been suppressed. (*Wong Sun, supra,* 371 U.S. at pp. 485-491 [9 L.Ed.2d at pp. 453-458].) We disagree. We discuss each claim in turn.

1. *Search of residence.* Defendant first urges that the December 14 search of his El Monte residence was invalid. Thus, he contends, the bloody knife and pants and the burned jacket discovered during the search should not have been admitted.

The People rely upon consent to justify the search. Defendant claims, however, that his purported consent to the search was tainted by the asserted constitutional and *Miranda* violations already discussed. He also contends that Lewis's technique for obtaining his consent—urging that he should be willing to permit a search if, as he claimed, he had nothing to hide—improperly forced him to choose between his search-and-seizure rights and his right against self-incrimination. (Citing *Simmons* v. *United States* (1968) 390 U.S. 377, 390-394 [19 L.Ed.2d 1247, 1256-1259, 88 S.Ct. 967] [defendant cannot be forced to admit possessory interest in incriminating item in order to challenge its seizure]; and *Crofoot* v. *Superior Court* (1981) 121 Cal.App.3d 717, 725-726 [175 Cal.Rptr. 530] ["consensual" backpack search invalid when consent obtained by implication that refusal to consent would be deemed incriminating].)

Whatever the merits of these arguments, the search is nonetheless supported by the independent consent of the cotenant of the residence, Cindy Cornwell. When one cotenant with joint control of the area to be searched is present on the premises, he or she may consent to the search despite the absence of others. (*United States* v. *Matlock* (1974) 415 U.S. 164, 171 [39 L.Ed.2d 242, 249-250, 94 S.Ct. 988], & fn. 7; *People* v. *Haskett* (1982) 30 Cal.3d 841, 856 [180 Cal.Rptr. 640, 640 P.2d 776].) Defendant conceded to the police that Cornwell had authority to consent, since "[i]t's her house."

Nor was Cornwell's decision to consent tainted by any improper police conduct toward *defendant*. There is no evidence or contention that Cornwell was improperly coerced to give her consent. It is true that Cornwell was told defendant had already consented, and she apparently withheld her own consent until she consulted with him by telephone. However, during

---

an attorney" indicates he did not understand that if he was indigent, counsel would be appointed free of charge.

their conversation, which Lewis overheard from defendant's end, defendant simply said that "it was her decision, it was her house, it was okay with him." Nothing in the conversation implied to her that his cooperation had been coerced, and defendant's words suggested that the matter was entirely in her hands. Thereafter, Cornwell consulted further with her lawyer, who also advised her to consent. Under these circumstances, no reason appears to impute "taint" to Cornwell's independent decision to permit a search. We see no basis to suppress the evidence found in the El Monte residence.[18]

 2. *Testimony of Kennedy.* Defendant contends that the testimony of John Kennedy, who drove defendant to and from the murder scene, should also have been excluded, since the police lead to Kennedy derived solely from the illegal questioning. We conclude, however, that Kennedy's identity and testimony would inevitably have been procured in any event.

There is no doubt that the lead by which the police actually reached Kennedy came from defendant. The investigating detectives acknowledged they had not heard of Kennedy until defendant mentioned him twice during the evening of December 14, 1982. Before being transported from El Monte to Fullerton that night, defendant told Detective Lewis that earlier in the week he had used a car belonging to "John's" mother "Mrs. Kennedy" to visit his parents in La Mirada (a city far from defendant's residence but relatively near the murder scene). Later, during his taped statement, defendant declared that he had driven to the victims' residence in a car "borrowed" from the mother of his friend John Kennedy. Directed by defendant, police found Kennedy's telephone number in defendant's residence and traced Kennedy's address through telephone company records.

Lewis went to Kennedy's residence and confronted him with the suspicion that he was with defendant on the night of the homicides. Kennedy "became visibly shaken and stated that he didn't want to go to jail on that type of thing." He later gave the police a detailed statement under a *Miranda* advisement.[19] As previously noted, Kennedy testified at defendant's trial under a grant of immunity.

---

[18] It is true that the searching officers were alerted to the pants and knife because in his station house interview, which was proceeding simultaneously, defendant had indicated their relevance and where they could be found. We need not suppress the physical evidence thus obtained, however. When advised about these items, the searching officers were already examining the bedroom closet in which they were found. Since both articles contained blood, no competent officer would have overlooked them in any event. Hence, they are admissible under the doctrine of "inevitable discovery." (*Nix* v. *Williams* (1984) 467 U.S. 431, 444-450 [81 L.Ed.2d 377, 387-391, 104 S.Ct. 2501]; *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 671-683 [145 Cal.Rptr. 795].)

[19] Although tape-recorded, Kennedy's formal statement to the police is not included in the record.

Even if Kennedy actually came to light through illegal police conduct, however, the evidence demonstrates the reasonable probability that his testimony would have been procured in any event by lawful means. (*Nix* v. *Williams, supra,* 467 U.S. 431, 444-450 [81 L.Ed.2d 377, 387-391]; *People* v. *Superior Court (Tunch), supra,* 80 Cal.App.3d 665, 680-681.) *Cindy Cornwell* knew of Kennedy's relationship to the case; her trial testimony, *which defendant has never challenged,* discloses that she saw the two men leave the El Monte house and return together on the afternoon and evening of December 7, 1982.

It further appears that Cornwell's knowledge would have been procured by the authorities both promptly and lawfully. Lacking a ready suspect for two brutal homicides, the police were pursuing a broad-based investigation of every person who might possibly be involved. They had already conducted substantial interviews with William Harbitz, his wife, his brother, and his son.

Defendant, like several members of the Harbitz family, had been identified early as a possible suspect. The detectives had located and conferred with defendant's parents, and had even asked defendant's father to help arrange a meeting with him. Hence, there seems little doubt under "usual and commonplace police investigative procedures" (*Tunch, supra,* 80 Cal.App.3d at p. 681; see *People* v. *Ramsey* (1969) 272 Cal.App.2d 302, 313 [77 Cal.Rptr. 249]) that persons in defendant's household would have been identified and contacted.

Contact with Cornwell actually did occur on the evening of December 14, when police asked her consent to search the residence she shared with defendant. Though initially hostile, Cornwell became cooperative after consulting defendant and obtaining legal advice. During the subsequent lawful search (see discussion, *ante*), the police found the bloody pants and knife. Asked about a denim jacket belonging to defendant, Cornwell volunteered that she had burned it earlier that evening in a hibachi on the kitchen stove. The police told her she might thereby be implicated. They placed her under arrest and advised her of her *Miranda* rights. She agreed to cooperate and talk about her involvement.[20] The apparent result was her testimony for the prosecution.

---

[20] As with the bloody pants and knife (see fn. 18, *ante*), the searching officers were alerted to look for the jacket because defendant had disclosed in the still-continuing station house interview that he had worn it on the evening of the homicides. This does not mean, however, that Cornwell's cooperation was the tainted product of illegal conduct. The officers would inevitably have discovered the burned jacket during the December 14 search and would have questioned Cornwell about this unusual and suspicious event. Cornwell herself testified at trial that ". . . I showed them exactly where it was. . . . I took them to the kitchen and showed them, 'Here it is,' *and there is little pieces of jacket flying around still.* [¶] And I

 ██ ██ ██ ██ We must therefore assume the authorities would have learned of Kennedy and his significance from Cornwell at about the same time he came to light through defendant.[21] Even if the lead supplied by defendant provided the leverage necessary to induce Kennedy's cooperation, Cornwell's information was at least as helpful in that regard. (Cf., *United States* v. *Ceccolini* (1978) 435 U.S. 268, 277-280 [55 L.Ed.2d 268, 277-279, 98 S.Ct. 1054]; *People* v. *Superior Court (Sosa)* (1982) 31 Cal.3d 883, 892-894 [185 Cal.Rptr. 113, 649 P.2d 696].) ██ ██ ██ ██ Under these circumstances, no valid purpose of the exclusionary rule is served by permanently suppressing the testimony of this important percipient witness.[22]

██ 3. *Wallet.* Our determination that Kennedy's cooperation would inevitably have been obtained also answers defendant's contention that the wallet discovered in the sewer gutter under the Temple City freeway offramp should have been suppressed. Kennedy testified at trial to the exact location where defendant disposed of this wallet. It is reasonably probable that, had defendant not done so, Kennedy would have led the police to this obscure spot in time to preserve the wallet's evidentiary value.

### E. *Prejudice.*

██,██ We have no doubt that the improper admission of defendant's statement warrants reversal, since, at the least, this tainted evidence was not harmless beyond a reasonable doubt. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)[23] The remaining evidence of defendant's involvement in the

---

showed them *the pieces of the jacket* and exactly where it was I had burned it. . . . [¶] . . . *The evidence was right there in the kitchen* when the police had already come." (Italics added.)

[21] Nor need the People prove in detail each step they could have taken without defendant's assistance to *locate* Kennedy. Cornwell knew Kennedy well; he visited defendant almost daily. As might be expected, Kennedy's telephone number was written down in the residence shared by defendant and Cornwell. With Cornwell's cooperation, and employing "usual and commonplace police investigative procedures" (*Tunch, supra,* 80 Cal.App.3d at p. 681), it seems reasonably probable that the police would have found Kennedy.

[22] The prosecution scarcely mentioned the "inevitable discovery" doctrine below. However, we need not apply the general rule (e.g., *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585, 511 P.2d 33]) that defenses not raised against the suppression motion in the trial court are waived on appeal. The facts pertinent to our finding of inevitable discovery were fully developed below. Defendant makes no claim that evidence not adduced in the trial court would contradict a finding of inevitable discovery. (See *Green, supra,* 40 Cal.3d at pp. 137-138.)

[23] California has followed the rule that "the improper introduction of a *confession* [i.e., a declaration of defendant's intentional participation in a criminal act] is considered reversible per se [citations], whereas wrongful introduction of an *admission* [i.e., the recital of facts tending to establish guilt when considered with the remaining evidence in the case] is deemed

stabbings and robberies was undeniably strong. Witness Kennedy drove him to the victims' residence at a time when the homicides most likely occurred. Defendant emerged from the house with a knife, a stab wound, and a suspicious story about what had happened inside. As the two men returned home by freeway, defendant rummaged through wallets and threw them out the car window. He told his girlfriend, Cindy Cornwell, a different story about how he was wounded. Just before the Fullerton officers arrived to question him, defendant told Cornwell he had done something wrong. Later that evening, and just before officers arrived to search the premises, Cornwell burned a jacket defendant apparently wore on the night he visited the victims. A bloodstained knife and pants soiled with blood similar to that of the victims were found in defendant's residence. A wallet linked to the victims was recovered from an obscure location described by Kennedy.

Yet all this evidence was circumstantial. We cannot be satisfied beyond a reasonable doubt that the jurors would have convicted defendant of the charged crimes had they not heard his taped statement describing in detail his brutal stabbing of the Harbitzes and the taking of their property. Nor, of course, may we assume defendant would have testified, conceding his identity as the killer, had the extrajudicial statement not been admitted. (*People* v. *McClary, supra,* 20 Cal.3d 218, 231.) The convictions must therefore be reversed.

### III. CONCLUSION

Our disposition makes it unnecessary to address defendant's remaining contentions. The judgment is reversed in its entirety.

Lucas, C. J., Mosk, J., Broussard, J., and Arguelles, J.,* concurred.

---

prejudicial unless the People show beyond a reasonable doubt that the error complained of did not contribute to the verdict. [Citations.] . . . ." (*People* v. *McClary, supra,* 20 Cal.3d 218, 230, italics in original.) This California distinction, never expressly divorced from federal law, is doubtful in light of *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101]. *Rose* emphasized that even federal constitutional errors are not subject to a per se reversal standard unless they render the entire trial "fundamentally unfair." The court acknowledged that a per se standard applies to introduction of a *coerced* confession, complete denial of the right to counsel, or adjudication by a biased judge. However, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis. . . ." (Pp. 577-579 [92 L.Ed.2d at pp. 470-471].) Under this reasoning, if a wrongfully introduced confession is invalid only for Fourth Amendment or prophylactic *Miranda* reasons, harmless-error analysis may be appropriate. Since we find reversible prejudice in this case under the *Chapman* standard (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]), we need not address whether defendant's statement was a "confession" or an "admission." Nor need we resolve defendant's claim that his "confession" *was* coerced by threats, promises, and other psychological ploys which offend fundamental notions of fairness.

 * Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

**PANELLI, J.**—I respectfully dissent.

I disagree with the majority's conclusion that defendant's taped statement should have been excluded on Fourth Amendment and *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) grounds. In my view, the circumstances of the initial detention and the interrogation do not, as the majority state, add up to an illegal arrest. Whether an illegal detention has occurred must be determined by *all the evidence* pertaining to the alleged restraint, and the final determination must be made on the basis of the *objective* reasonableness of the defendant's concern that he was being restrained without his consent. Protestations to the contrary, the majority first question the voluntariness of defendant's consent to the interview and then focus almost exclusively on defendant's state of mind during the interrogation as he countered the detective's questioning, ignoring the consensual nature of his presence at the station house and ignoring the events subsequent to the interrogation which reinforce a conclusion that no illegal detention had occurred or was occurring. I am troubled and concerned that the subjective standard used by the majority portends a severe limitation, if not elimination, of the voluntary, noncustodial police station interview.

Here both a magistrate and trial judge reviewed the evidence concerning the interview, at the preliminary hearing and during the Penal Code section 1538.5 suppression hearing that preceded the first trial, and each *rejected* the defendant's challenge to the incriminating statements. The hearing judge necessarily made a number of critical findings, assessed defendant's credibility in significant areas, and drew inferences that support his ruling.

I recognize and acknowledge that the scope of review in this court is not simply whether there is substantial evidence in the record to support the trial court's ruling that defendant's statement was not the product of an illegal seizure. In the exercise of our independent judgment as to whether the detention violated the constitutional standard of reasonableness, however, we must accept the trial court's resolution of disputed facts and its assessment of the credibility of witnesses. These are cardinal principles of appellate review. Furthermore, reasonable inferences deduced from the facts as found by the trial court are necessarily supported by substantial evidence, and a reviewing court is without power to substitute its deductions for those of the trial court. (See *People* v. *James* (1977) 19 Cal.3d 99, 107 [137 Cal.Rptr. 447, 501 P.2d 1135] [voluntariness of consent]; *In re Eric J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549] [interrogation without *Miranda* warnings]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-598 [174 Cal.Rptr. 867, 629 P.2d 961] [investigative detention]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621] [pat-

down search of sleeping bag]; *People* v. *Duren* (1973) 9 Cal.3d 218, 241-242 [107 Cal.Rptr. 157, 507 P.2d 1365] [waiver].)

In my view, defendant's encounter with the police can be divided into three parts: (1) the initial approach and consent to the interview at the station house; (2) the interrogation; and (3) the period that followed the termination of the interview during which defendant incriminated himself.

First, we must accept the trial court's finding that defendant *consented* to an interview at the police station and *voluntarily* subjected himself to interrogation. The manner and circumstances of the transport confirm that the police relied on that consent in transporting him to the station for questioning. Thus, the initial approach to defendant was by plainclothes officers in unmarked cars; defendant requested and was given permission to take his girlfriend with him to the station; she did not go with defendant but was told he would be gone about three hours, which included two hours of travel time; defendant was transported alone in the backseat; there was no cage between the front and rear passenger sections; defendant was not handcuffed or overtly restrained, and the doors of the vehicle were unlocked during transport. At the station, defendant was placed in a room used for noncustodial as well as custodial interrogation.

The interrogation presents a closer question. Conceding that the interrogation was aggressive and at times accusatory, the record is nevertheless devoid of evidence that defendant involuntarily remained in the room or involuntarily continued to respond to the interrogation. While his repeated question as to his status revealed some doubt on his part as to whether he was free to terminate the interrogation and return home, the fact remains that when defendant stated that he wanted an attorney and wanted to terminate the interview, the officers turned off the tape recorder and stopped their questioning. As noted above, I believe the majority has erred by focusing almost exclusively on the defendant's state of mind during the interrogation and ignoring the subsequent events which reinforce the conclusion that no illegal detention *had* occurred.

Moreover, even assuming, arguendo, that defendant was illegally detained (that is, either physically deprived of his freedom or led to believe that he was so deprived) during the interrogation, it is clear that the incriminating statement was not obtained by exploitation of the illegality.

Thus, once questioning ceased, defendant gave his consent to search the El Monte residence. He was asked and agreed to have fingerprints taken *for elimination purposes*. During this time he was twice told, in response to inquiry, that *he was not under arrest*. Importantly, no questioning occurred

during the 25 or 30 minutes it took to walk defendant over to the jail, fingerprint him, and return him to the station. Thereafter the officer reminded defendant that he could not be questioned further. The officer also made remarks which reasonably suggested that, while still under suspicion, defendant was no longer the sole focus of investigation and was about to be released. It was at this point, as the officer turned to leave the room to arrange transportation home for defendant, that defendant called him back and blurted out the incriminating statement concerning his involvement in the killings, "I did it." The tape recording machine was then reactivated, and, following a waiver of his *Miranda* rights, defendant confessed.

The instant case was not defendant's first encounter with the police. He had had prior experience with law enforcement officials in several incidents of arrest or detention. Whatever he may have feared concerning his status during the interrogation, he could not reasonably have believed, in the period following the cessation of the interrogation, that he was being, or would be detained.

In sum, the findings of the trial court and the inferences that can be drawn therefrom support the conclusion that the defendant's statement was not the fruit of an illegal arrest. Measuring those facts and inferences against the constitutional standard of reasonableness, and exercising independent judgment thereon, I agree with the trial court that the confession is admissible.

Further, I do not agree with the majority that the defendant's confession was obtained in contravention of *Miranda*. Even if it were decided that defendant was being subjected to custodial interrogation when he made his initial incriminating statement, "I did it," the fact remains that he was given *Miranda* advisements before the interrogation commenced and the questioning stopped when he invoked his right to remain silent. The incriminating statement was clearly a spontaneous outburst which falls outside the proscriptions of *Miranda*. Thereafter defendant voluntarily, knowingly, and intelligently rewaived his *Miranda* rights.

Kaufman, J., concurred.

Respondent's petition for a rehearing was denied May 22, 1989, and the opinion was modified to read as printed above.