Filed 4/15/15  P. v. Williams CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 4

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TERRY WILLIAMS,<br><br>        Defendant and Appellant. | A138843<br><br>(Contra Costa County<br>  Super. Ct. No. 51222181) |

Defendant appeals a judgment entered upon a jury verdict finding him guilty of first degree residential burglary.  (Pen. Code, §§ 459, 460, subd. (a).)  He contends the magistrate improperly denied his motion to suppress evidence found in an illegal search and that the court erred in admitting statements obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) into evidence.  We shall affirm the judgment.

## I.  BACKGROUND

The evidence at the preliminary hearing showed that defendant lived with his grandmother in a home next door to the victim's residence.  In November 2012, the victim received an automatic e-mail from his home video surveillance system showing photos of a person on the side of his house and in his living room, and a picture of a shoe. He called the Contra Costa County Sheriff's Department.  Deputy Sheriff Joseph England was dispatched to the victim's home to investigate.

England found a shattered window and an alarm keyboard box that had been pulled from the wall.  England concluded the home had been burglarized.  He conducted an "area canvass" to investigate whether neighbors in the area had information about the

1

burglary. He went to the house next door and spoke with defendant, who said he had been home but had not heard or seen anything. As they spoke, Reginald Ward parked in the street and walked up the driveway of the house. He told England he had been gone at work all day and had no information. It appeared to England that Ward had just gotten home.

When the victim returned home later that day, he found that a television, three outdoor cameras, and a blanket were missing. He also thought that over $4,000 in cash was missing, but later found the money undisturbed. He told England he had noticed a television wire stuck to the fence that separated the neighbors' houses.

The next day, the victim showed England the still images from his cell phone. He told England the person in the images looked familiar and might be his next door neighbor. One of the pictures showed the culprit's shoe. England asked the victim about his next-door neighbors, and was told that an elderly woman, an approximately 50-year old man, and a young man lived in the home.[1]

England went back to defendant's home and knocked on the front door, and Ward answered. England showed him the pictures and Ward said the person in the images looked like defendant, and that the shoe from the picture looked like defendant's shoe. England asked Ward if any of the missing items were in the house, and Ward replied that "he did not believe so, but let's come inside and check." England asked what Ward's relationship was to defendant, and Ward said he was defendant's uncle.

Ward led England through the house, and they did not see the missing items. England asked Ward what was in the shed in the backyard. Ward led England to the unlocked shed, where he found a television and blanket consistent with the victim's account of what had been stolen. Although it contained a futon, the shed did not appear to be a bedroom.

England asked Ward whether defendant was staying in the shed. Ward told him he did not know, and that he would have to check with defendant's grandmother, who

---

[1] Ward was approximately 54 years old.

owned the house.[2]  England "froze" the investigation and Ward called the grandmother, who was in Texas.  Defendant's grandmother told England that Ward had been house-sitting while she was away, and gave him permission to continue the search.  England showed the television and blanket to the victim, who said they were his.

England later returned to defendant's home and asked to speak with defendant in private.  Defendant led him into his bedroom inside the house.  The door was open.  England told defendant that he had reviewed video surveillance and found the blanket and television, and that he knew that defendant had committed the burglary.  Defendant placed his head down and said nothing.  England said he needed to know where the stolen cash was, and defendant said it would take a few days to get the money back.  England told defendant he needed to leave with him and go in his patrol car.  Defendant reached for a pair of shoes, which England recognized from the photos taken by the home surveillance system.

England handcuffed defendant, placed him in the patrol car, and advised him of his *Miranda* rights.  Defendant answered in the affirmative when England asked him whether he understood his rights.  Defendant then admitted to committing the burglary, hiding the items in the shed, and damaging the surveillance system.

Defendant moved to suppress the evidence found in the shed and his statements to England under Penal Code section 1538.5 on the grounds that they were obtained during an illegal warrantless search.  The magistrate denied the motion.  In doing so, the magistrate found that defendant had a sufficient expectation of privacy in the shed to bring the motion, but that in the circumstances, it was reasonable for England to believe Ward had authority to consent to the search.

At trial, defendant moved to dismiss the information pursuant to Penal Code section 995 on the grounds that the magistrate erred in denying his motion to suppress.  The trial court denied the motion.

---

[2] England also testified that after Ward opened the shed door, he said he believed defendant used it.

3

Defendant also made a motion in limine to exclude the statements he made to England, contending they were obtained in violation of his *Miranda* rights. The trial court reviewed the transcript of the preliminary hearing and heard additional evidence. England testified that when he arrived at the defendant's home the day after the burglary, defendant was sitting in the living room. England asked defendant to speak with him in private, and defendant agreed. Another uniformed deputy sheriff was standing outside the front door. The other deputy stood in the hallway outside the bedroom door while England and defendant spoke in the bedroom. Defendant sat on the bed and England stood near the doorway. The first thing England told defendant was that he had seen the surveillance video and knew defendant had committed the burglary. Defendant put his head down. England next asked about the cash, and when defendant made an incriminating response, England ended the interview, handcuffed him, and placed him in the patrol car. The interview was brief. At no point during the interview in the bedroom did England tell defendant he was free to leave.

Before arresting defendant, England did not handcuff him or draw his weapon. He did not ask any questions between arresting defendant and advising him of his *Miranda* rights. Defendant said he understood his rights. Defendant was 18 years old. Defendant's adoptive mother (his grandmother) testified that he had been in a special educational program at school and that he displayed difficulties in understanding her in her everyday dealings with him.

The trial court denied the motion to exclude defendant's statements to England. In doing so, the court found that defendant was not in a custodial setting when England questioned him in the bedroom, and that defendant spoke with England voluntarily.

At trial, England testified that after he advised defendant of his *Miranda* rights, defendant told him that he had taken the video cameras off the wall and thrown them into the sewer and that he put the television set and blanket into the shed. He said he committed the burglary because he needed money to travel to San Francisco, and that he planned to sell the stolen property.

A jury found defendant guilty of first degree burglary.

## II. DISCUSSION

### A.     Third-Party Consent to Search

Defendant contends the magistrate erred in denying his motion to suppress evidence found as a result of Ward's consent to search the premises. According to defendant, the evidence gathered after the search of the home and shed should be suppressed because Ward was only a temporary house-sitter and lacked authority to consent to the search of the shed.

Our standard of review is well settled. A defendant may challenge a magistrate's ruling on a motion to suppress on appeal, following a conviction by plea or at trial. (*People v. Mena* (2012) 54 Cal.4th 146, 156.) Where a defendant's motion challenging the reasonableness of a search is based upon the evidence adduced at the preliminary hearing, the trial court is bound by the factual findings of the magistrate. (*Anderson v. Superior Court* (1988) 206 Cal.App.3d 533, 538-539.) "On appeal, we do not review the findings of the [trial] court since it acts as a reviewing, and not a fact-finding court. Rather, 'the appellate court disregards the findings of the trial court and reviews the determination of the magistrate who ruled on the motion to suppress.' [Citation.] 'In doing so, "all presumptions are drawn in favor of the factual determinations of the [magistrate] and the appellate court must uphold the [magistrate's] expressed or implied findings if they are supported by substantial evidence." ' [Citation.]" (*People v. Snead* (1991) 1 Cal.App.4th 380, 384, fn. omitted.)

Although entry into a house without a warrant is presumptively unlawful, the presumption is rebutted if the law enforcement officer's entry is made pursuant to valid consent. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 222; *Florida v. Jimeno* (1991) 500 U.S. 248, 251.) "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." (*United States v. Matlock* (1974) 415 U.S. 164, 170.)

Here, as defendant points out, consent was initially given not by the homeowner but by Ward, who was house-sitting, and the search encompassed the shed, over which defendant contends Ward lacked actual or apparent authority. These facts are not

dispositive. Warrantless entry is valid if consent is given by a third party, so long as the law enforcement officer has a reasonable belief that the third party possesses common authority over the premises, even if the third party does not, in fact, have that authority. As our high court has explained, "[A] guest who has the run of the house in the occupant's absence has the apparent authority to give consent to enter an area where a visitor normally would be received. [Citations.] Furthermore, the police may assume, without further inquiry, that a person who answers the door in response to their knock has the authority to let them enter. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 703.)

We conclude that it was reasonable for Deputy England to believe Ward had authority to consent to the search of the premises, including the shed. The victim had told England that the home was inhabited by three occupants, including a person matching Ward's description. England was told that Ward was defendant's relative. Each time England went to defendant's home, Ward was present, once apparently coming home after work and arriving on the property as England spoke to defendant. Ward answered the door when England visited the home for the second time. When England conducted the initial area canvass, defendant answered the front door, suggesting to England that defendant lived in the house, and not in the shed. In short, Ward appeared to live at the house, and defendant gave no indication that he lived in the shed.

We recognize that the magistrate concluded defendant had an expectation of privacy in the shed. However, Ward presented himself to England as someone who had authority to consent to the search of the shed, and there was no indication that when England looked into the shed, there was reason to believe it was not a common area. Contrary to defendant's argument, Ward's lack of knowledge whether the stolen items were in the shed did not suggest that Ward never used the shed, but only that he had no knowledge of the contents of the shed at that time.[3] On this record, England could

_____

[3] Defendant relies on *Illinois v. Rodriguez* (1990) 497 U.S. 177, 188 for the proposition that Ward's lack of knowledge about the contents of the shed should have put England on inquiry notice about its mutual use. That case, however, is inapposite, as it

6

reasonably conclude that Ward had the "run of the house," including the backyard and the shed. Thus, the third-party consent to the search of the house and shed is valid, and the magistrate properly denied the motion to suppress the evidence obtained in the search.

## B. Admissibility of Defendant's Statements

Defendant contends the trial court violated his rights under the Fifth Amendment of the United States Constitution by admitting the statements he made to England. According to defendant, he was in custody when he made his initial statement to England in his bedroom and he could not properly be questioned without receiving *Miranda* warnings. Defendant also argues that his further statements, made after he received his *Miranda* advisements, were inadmissible because they were made only after he had already made incriminating admissions, and there was no showing the taint of the earlier improperly obtained statements had been dissipated.

"In applying *Miranda*, . . . one normally begins by asking whether custodial interrogation has taken place. 'The phrase "custodial interrogation" is crucial. The adjective [custodial] encompasses any situation in which "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [Citations.] The noun [interrogation] "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." ' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 732.) In reviewing a ruling of whether a defendant is in custody, the court "must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported." (*People v. Crittenden* (1994) 9 Cal.4th 83, 128.) The court determines independently, based on the undisputed facts and those properly found by the trial court, whether the challenged statements were legally obtained. (*Ibid.*)

_____

addresses the very different question of whether a hotel clerk can validly consent to a search of a hotel patron's room.

7

The *Miranda* rule does not apply to every situation involving the questioning of a criminal suspect: "*Miranda* applies to questioning under the coercive conditions of official 'custody.' [Citation.] "Custody" means 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*People v. Boyer* (1989) 48 Cal.3d 247, 271 (*Boyer*).) The *Miranda* rule requires that a person being interrogated must be told of his or her *Miranda* rights when "in custody at the station or otherwise deprived of his freedom of action in any significant way." (*Miranda*, 384 U.S. at 477.) "The test for whether an individual is in custody is objective." (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) First, we examine the circumstances surrounding the interrogation. This inquiry is strictly factual, and we apply to it the deferential substantial evidence standard. Second, we ask whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave; this is a determination we make independently. (*Id.* at pp. 401-402.) Among the objective indicia of custody are: "(1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of questioning." (*Boyer*, *supra*, 48 Cal.3d at p. 272; accord, *People v. Moore* (2011) 51 Cal.4th 386, 395.)

For example, in *Boyer*, officers determined that the defendant was a possible suspect in a double homicide case. (*Boyer*, *supra*, 48 Cal.3d. at p. 263.) Detectives went to the defendant's home, with two police officers guarding the rear of the house as the detectives knocked on the front door in order to detain the defendant if he tried to flee. (*Ibid.*) As the suspect emerged from the rear, law enforcement told him to "freeze." (*Ibid.*) An officer asked the defendant whether he would voluntarily accompany them to the station, and he agreed. (*Id.* at p. 264.) The defendant was frisked for weapons before entering the patrol car, and was told to take a seat in the back. (*Ibid.*) At the police station, officers advised him of his *Miranda* rights after leading him to an interrogation room, where he later confessed to the crime. (*Id.* at pp. 264–265). The defendant contended that his incriminating statements were not admissible because he was unlawfully detained. (*Id.* at p. 267.) The court agreed, concluding that the indicia of

8

arrest were present during the initial encounter at the home, where law enforcement "suggested they did not intend to take no for an answer." (*Id.* at p. 268.)

In contrast, in *Green v. Superior Court*, the court found that a custodial interrogation had not taken place when the defendant was asked if he could be interviewed by two officers, who then drove him to the police station and conducted the interview in a room without windows and with a locked door. (*Green v. Superior Court* (1985) 40 Cal.3d 126, 131.) The initial interview lasted for over an hour. (*Ibid.*) The defendant was asked to wait while the officers attended to other matters, and the defendant complied with the request, after which the officers resumed their questioning. (*Id.*) Defendant was never told he was free to leave. (*Id.* at p. 132.) The court held that the circumstances did not present a custodial interrogation because the evidence did not "compel the conclusion that defendant could not have left whenever he wanted during the interview." (*Id.* at p. 136.)

In our view, a reasonable person in defendant's situation would have realized he was free to end the conversation. We recognize that England told defendant he knew he had committed the burglary and that the trial court found England's suspicion had focused on defendant.[4] However, the other objective indicia of arrest were not present. Defendant was not restrained or told he could not leave. The questioning took place in his own home rather than an interrogation room. Defendant was asked if he could be spoken with in private, and led England into his own bedroom. No facts suggest defendant was compelled to agree to the interview. Although a second officer stood in the hallway, the door to the bedroom where the questioning took place remained open. Moreover, the questioning was very brief. In the circumstances, we agree with the trial

---

[4] In *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, our Supreme Court disapproved *Boyer* to the extent it suggested an officer's subjective suspicion was an independently relevant factor in establishing custody. However, the degree to which an investigation has focused on a defendant may still be considered as part of the totality of the circumstances of an interrogation in order to determine how a reasonable person in the defendant's circumstances would have understood his situation. (*People v. Moore, supra,* 51 Cal.4th at p. 395.)

court that defendant was not in custody at the time he made his first incriminating statement, and it was therefore not obtained in violation of *Miranda*.

Because defendant's first statement to England was not obtained in violation of *Miranda*, we reject his contention that his later, post-*Miranda* statements were tainted by any illegality.

## III.  DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Streeter, J.