Filed 3/17/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E064121 |
| v. | (Super.Ct.No. RIF1300143) |
| LAMONTE TYREE RUSSELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.

Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief

Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr.,

---

[*]  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, IV, and VI.

Randall D. Einhorn, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

Defendant Lamonte Tyree Russell and codefendants, Ronald Edward Butterfield and Eric Lamichael Deon Williams, were charged with committing attempted murder (Pen. Code, §§ 664, 187;[1] count 1), aggravated mayhem (§ 205; count 2), torture (§ 206; count 3), and assault with a deadly weapon (§ 245, subd. (a)(1); count 4). The trial court severed defendant's trial from the other two defendants' trial. The jury found defendant guilty of aggravated mayhem, torture, and assault with a deadly weapon, but not guilty of attempted murder. The trial court sentenced defendant to seven years to life in prison.

Defendant appeals his convictions on the grounds there was no unanimous oral declaration of a guilty jury verdict and the trial court erred in denying his motion to exclude statements he made during a police interview before he was advised of his *Miranda*[2] rights. Defendant also contends the trial court violated his constitutional due process rights by failing to disclose Juror No. 11's identifying information, and by not subpoenaing Juror No. 11 to testify regarding juror misconduct disclosed to trial counsel. We reject defendant's objections for the reasons stated below and affirm the judgment.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

## FACTS

On January 12, 2013, Gabriel, a student at the University of California Riverside, hosted a party at his apartment near the college campus. Twenty or thirty of his friends attended the party. Defendant and two companions, Ronald Butterfield and Eric Williams, who were unknown to Gabriel, entered Gabriel's apartment uninvited. As they entered, Gabriel asked the three men to leave. Rather than leaving, they proceeded further into the apartment and one of the men pushed an invited guest. Another guest, David,[3] punched Williams in the mouth, knocking out a tooth. The invited guests then pushed defendant and his two companions out of the apartment.

Upon being ejected, with the door locked behind them, defendant and his companions rammed the door in an attempt to reenter the apartment. The men broke the door lock and door frame. The three men eventually left but threatened to return. One of the men said they were "coming back with the blaze," which Gabriel understood to mean they would bring guns. Someone called the police, who checked out the scene and then left. Some of the party guests remained at Gabriel's party for several hours, fearing the three men would attack the guests as they left the apartment.

At around 3:00 a.m., party guests, Adam, David, Nathan, and K.K., left the apartment together. As they walked out of the apartment building, defendant, Butterfield, Williams, and another individual attacked the departing guests. Williams had a knife,

---

[3] Also known as Alex.

Butterfield had a metal bat, and defendant had a hammer. The party guests ran in different directions. Williams chased Adam, threatening, "Call the police and I'll kill you."

Meanwhile, Butterfield and defendant chased David and K.K. Butterfield whacked David with a bat, full force in the back of the head and upper back. David fell, landing on his back, and did not move. Butterfield forcefully hit David with the bat again two more times and stomped on his head. Defendant kicked David a few times while David lay on the ground. David suffered from a fractured skull and blood clots on his brain. He remained in a coma for several days, close to death. David underwent brain surgery, with hospitalization for 21 days. At the time of trial, David lacked fine motor skills in his right hand.

During a videotaped police interview, defendant admitted he went to a party at Gabriel's apartment with Williams and Butterfield, also known as "Biz." Defendant said that after he and his companions were ejected from the party, they happened to be walking around in the area of the apartment complex when the party ended. Defendant took a bat out of the car in case he had to defend himself and his friends. Defendant anticipated they would "get into something" because Williams's teeth had just been knocked out.

Defendant admitted being at the scene of the attack on David but denied participating in the attack and denied chasing anyone. He claimed he just stood nearby with a bat for protection. Defendant denied seeing what the others were doing because he

4

was not next to them. He was looking around to make sure no one, including the police, sneaked up on them.

III

UNANIMOUS ORAL JURY VERDICT

Defendant objects that there was no unanimous oral declaration of the guilty verdicts.

*A. Procedural Background*

The jury returned guilty verdicts on counts 2, 3, and 4, and a not guilty verdict on count 1. Defense counsel requested the jury be polled "[j]ust once as to all counts." The court asked the jurors to "respond 'yes' or 'no' if these are your individual verdicts." The court clerk polled each juror. When the clerk polled Juror No. 11 (TJ11), the juror said "[n]o." After the clerk polled the last juror, Juror No. 12, the court attempted to confirm and clarify TJ11's negative response:

"THE COURT: Did we hear from Juror No. 11?

"TJ11: I said 'No.'

"THE COURT: You said 'No'?

"TJ11: Are we doing Count 1? I'm sorry.

"THE COURT: No. We're asking you if the verdicts that were read, Count 1 not guilty, guilty Counts 2, 3, and 4, if those were your individual verdicts.

"TJ11: Yes.

"THE COURT: All right. Then both sides stipulate the verdicts can be recorded as read?

"[Defense Counsel]: Yes, your Honor.

5

"[Prosecutor]:  Yes, your Honor."

The trial court then informed the jury that their jury service had concluded.

*B.  Applicable Law*

Among the essential elements of the right to jury trial "are the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous. [Citations.]  [¶]  . . .  The requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations . . . .  The elements of number and unanimity combine to form an essential element of unity in the verdict. . . . 'Unanimity obviously requires that each juror must vote for and acquiesce in the verdict.' [Citation.]  The jurors must appear in court and be asked 'whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same.'  (Pen. Code, § 1149.)  Significantly, it is 'the oral declaration of the jurors, not the submission of the written verdict forms [that] constitutes the *return* of the verdict.'  [Citations.]  Thus, 'there is no verdict absent unanimity in the oral declaration.' [Citation.]"  (*People v. Traugott* (2010) 184 Cal.App.4th 492, 500.)

When a juror makes equivocal or conflicting statements as to whether the juror has assented to the verdict freely and voluntarily, a direct question of fact within the determination of the trial judge is presented.  (*People v. Superior Court* (1967) 67 Cal.2d 929, 932.)  "The trial judge has the opportunity to observe the subtle factors of demeanor and tone of voice which mark the distinction between acquiescence and evasion of individual choice.  The trial judge can determine whether returning the jury for further deliberation is likely to secure a real verdict, or whether the juror has really disagreed so

6

that the verdict is not unanimous and not likely to become so." (*Ibid.*) Under such circumstances, the trial court must determine the state of mind of the juror, with the determination of the matter resting within the discretion of the trial judge. (*Id.* at p. 933.)

### C. Discussion

Here, the record supports the trial court determination that there was juror unanimity in the oral declaration of the verdict. The trial court reasonably concluded TJ11 stated orally that the announced verdicts were her own. Defendant's assertion to the contrary is misguided. TJ11's statements when polled were not equivocal or conflicting regarding whether she assented to the verdict freely and voluntarily. The trial court reasonably concluded TJ11's "yes" response following the court's followup inquiry confirmed that defendant's guilty verdicts to counts 2, 3, and 4 were TJ11's individual verdicts. The transcript of the court polling the jury indicates that TJ11 initially responded "no" when polled because she erroneously thought she was being asked what her verdict was as to count 1, in which the jury found defendant not guilty. The transcript can be reasonably construed as stating that, after the court clarified that it was asking TJ11 whether the verdicts that were read as to all counts were her individual verdicts, TJ11 indicated they were by stating "yes." This confirmed TJ11, along with each of the other jurors, orally stated during polling that the verdicts were her own. The trial court reasonably concluded there was juror unanimity in the oral declaration of the verdict.

IV

COMPLIANCE WITH *MIRANDA*

Defendant contends his fifth amendment rights were violated by the trial court denying his motion to exclude evidence of his statements obtained in violation of his *Miranda* rights.

A. *Procedural Background*

Defendant brought a pretrial motion to exclude his statements to the police made before he was advised of his *Miranda* rights. Defendant argued his statements were obtained in violation of *Miranda* because he was in custody when he made the statements. The trial court held an Evidence Code section 402 hearing (402 hearing) to determine whether defendant was in custody at the time. Three patrol officers and the interviewing detective testified at the hearing.

Officer Pap testified he was dispatched at 3:13 a.m. regarding the assault at Sterling Highlands Apartments. Around 10 minutes later he detained defendant and Williams, who were found near the apartments arguing. Pap sat the two men down on the curb and handcuffed them out of concern for his own safety, because he was by himself with two possible suspects. Pap also did a patdown search of the men for weapons. After defendant and Williams sat on the curb handcuffed for about an hour, infield identifications were conducted after officers Cruz and Delatorre arrived. Pap testified he never told defendant or Williams they were under arrest. He told defendant he was being detained while law enforcement was conducting an investigation. Pap did

not draw his gun. The two men were cooperative. Before Pap left, he took his handcuffs off the two men.

Officer Delatorre testified at the 402 hearing that he also responded to a dispatch call at around 3:13 a.m. When he arrived about 10 minutes later at the site where Pap had detained defendant and Williams, he saw the two individuals handcuffed. Handcuffing the men for safety purposes was typical where an officer was alone with two suspects. During the infield identifications, witnesses identified Williams as a participant in the charged assault. Defendant was not identified. Therefore his handcuffs were removed. Delatorre testified defendant could have left at that point but chose not to. Delatorre asked defendant if he would talk to police detectives at the police station. Defendant agreed to do so. Defendant was not under arrest and did not have to go with Delatorre. He was free to leave although Delatorre did not tell him that.

Delatorre transported defendant to the station at around 6:20 a.m. Defendant was not wearing handcuffs in the back of the patrol car. Officer Cruz transported Williams to the station. Delatorre and Cruz did not tell defendant he was under arrest. Upon arriving at the station, Delatorre escorted defendant into an interview room. Defendant was not wearing handcuffs.

Officer Cruz testified she responded to a dispatch call stating that a male had been hit in the head and was lying in the street. She did not come in contact with the suspects until after the infield lineups. The first lineup was at around 4:15 a.m. and the second was at 4:27 a.m. The two witnesses, K.K. and Adam, identified Williams but not defendant. During the lineups, defendant was not under arrest. He was detained. After

9

the infield lineups, Williams, who was handcuffed, was placed in the back seat of Cruz's patrol car. Defendant was placed in the back of another patrol car. Cruz did not tell defendant at any time that he was under arrest or put handcuffs on him.

Detective Rowe testified he interviewed defendant after Rowe arrived at the police station around 6:30 a.m. Defendant and Williams were in separate, adjacent interview rooms. Around 8:00 a.m., Detectives Brandt and Rowe began interviewing defendant. The interview was videotaped. Defendant was not handcuffed while interviewed. During the interview, Rowe told defendant he was not under arrest and that Rowe appreciated defendant coming to the police station. Defendant never stated that he did not want to speak with Rowe, ask to leave, or say he no longer wanted to talk. Rowe told defendant to let him know if defendant needed anything to drink or needed to use the bathroom.

The interview was in two segments, with the first lasting about 50 minutes. Between segments, Rowe and Brandt interviewed Williams. Rowe testified he did not consider defendant a suspect because he was not in handcuffs, he had not been identified, and additional followup was needed to identify the other perpetrators. During both segments of defendant's interview, Rowe told defendant several times that Rowe did not believe defendant was the person who hit the victim. Rowe attempted to find out from defendant what happened and who was involved.

During the first part of the interview, Rowe was frustrated with defendant's responses because defendant was evasive and not answering his questions. This was why Rowe stopped the interview and interviewed Williams. During the first part of the

10

interview, Rowe's demeanor was not confrontational. The second part was a little more "heated" because, after speaking with Williams, Rowe believed defendant was not answering his questions truthfully.

When Rowe interviewed Williams, defendant was left alone in the interview room. Williams's interview lasted almost two hours, from about 8:50 a.m. to 10:41 a.m. When Rowe and Brandt left defendant in his interview room, they told defendant they were going to talk to Williams and then return. They did not tell defendant he was free to leave. Rowe said that, most likely, defendant's door was locked while left alone in the room because it was Saturday morning and there were no other officers at the police station outside defendant's interview room. If the door was not locked, defendant would have had access to the entire police station, which was a safety concern.

After interviewing Williams, Rowe returned to defendant's interview room at around 10:41 a.m. Defendant was sleeping on the floor. Defendant had been up all night and said he was lying down because his stomach was upset. He asked for something to eat. Rowe said he did not have anything at that moment but might be able to get some pretzels. Rowe did not give defendant any food other than pretzels.

Rowe testified he repeatedly told defendant throughout the second part of the interview, which lasted about 20 minutes, that he did not believe defendant hit anyone with a bat. During defendant's interview, defendant admitted that during the assault, he was carrying a baseball bat but denied he had seen the assault or was present. Rowe told defendant Rowe might have to read defendant his *Miranda* rights, but ultimately did not do so. Nothing Williams said during his interview led Rowe to believe at that point that

11

defendant was a suspect who had participated in the assault or acted as an aider and abettor. Williams said defendant had a bat but Williams did not know who hit the victim and he never saw defendant hit anyone with a bat.

Because more investigation was needed, defendant and Williams were released at the end of their interviews. Rowe was still unclear as to what happened during the assault. He wanted to reinterview the victims and witnesses. Rowe believed at that point neither Williams nor defendant needed to be taken into custody. If at any time defendant had wanted to leave the interview, he could have left. While left alone in his interview room, which was next door to Williams's interview room, defendant could have knocked or banged on the door to get Rowe's attention while Rowe was interviewing Williams.

The court took a recess during the hearing on defendant's motion to exclude his statements, during which the court viewed defendant's videotaped interview. During the interview, Rowe warned defendant that Rowe was going to talk to Williams and had talked to others and, if he found out defendant was lying, "then there may be an issue . . . before [¶] . . . [¶] we're done with all this. [¶] . . . [¶] So you just need to be honest with me. . . ." When Rowe concluded he was not making any progress with defendant, he told defendant he was going to interview Williams in the interview room next door and then return to talk to defendant to make sure Williams was being honest with him. Rowe added that if defendant needed anything, to let Rowe know.

After interviewing Williams, Rowe resumed interviewing defendant, noting that, after talking to Williams and a couple of others, Rowe believed defendant had not been entirely truthful. Rowe added he had not read defendant his rights yet, but it was "almost

12

to the point where [I] . . . might have to read you your rights. Because I don't think you're being honest with me." Defendant said he was being honest. Rowe told defendant that if he was going to stick with his story that he did not do anything, then defendant would likely be booked and end up in jail. Rowe said, "or if you wanna tell me the truth about exactly what happened at the apartment complex." Rowe noted the victim of the assault was hit with a bat and was in a coma. Rowe added he was not accusing defendant of hitting anyone with a bat. Rowe said that if defendant continued to claim that he did not know anything about how the victim was hit with a bat, Rowe was going to discuss with his partner booking defendant in jail as an accessory, because Williams said that defendant and his companions were all present when the victim was hit with a bat.

Defendant continued to deny hitting anyone with a bat or seeing anyone hit with a bat. Defendant admitted he left out that he saw Williams and two others chase three individuals. Rowe said that was important information defendant left out. Rowe added that the reason he did not read defendant his rights was because Rowe was not accusing him of doing anything. Rowe said he did not have any reason to believe defendant was the one who hit the victim with a bat. Rowe simply wanted defendant to tell him the truth about what happened and not leave out crucial information. Defendant continued to deny he saw anyone else with a bat.

Rowe told defendant he was going to ask Williams where defendant was standing when the victim was hit with a bat. Defendant asked for pretzels and said he was going to lie down. After defendant had been sleeping in the interview room for a while, Brandt

13

told defendant to wake up so that his picture could be taken and he then could leave. Defendant was not in handcuffs. Defendant ate a lot of pretzels but was still hungry and sleepy when he was released at the end of his interview.

After the trial court reviewed defendant's interview videotapes and other evidence, the court resumed the hearing on defendant's motion to suppress. The court heard oral argument and then denied defendant's motion to suppress his statements made to the police. The court found that defendant was not in custody at the time of defendant's interviews and therefore the police were not required to advise him of his *Miranda* rights before taking his statement.

## B. Applicable Law Regarding Miranda

Under *Miranda, supra,* 384 U.S. 436, a person questioned by the police after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Id.* at p. 444.) Statements obtained in violation of this rule are inadmissible to establish guilt. (*Ibid.*)

"*Miranda* advisements are required only when a person is subjected to 'custodial interrogation.' [Citations.] 'Custodial' means 'any situation in which "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."' [Citation.] Interrogation '"refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably

14

likely to elicit an incriminating response from the suspect.'" [Citations.]" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).)

The primary issue here is whether defendant was "taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra,* 384 U.S. at p. 444.) In making this determination, the trial court was required to determine the circumstances surrounding the interrogation. The court was then required to weigh these circumstances against an objective, legal standard: "would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest. [Citations.]" (*Aguilera, supra,* 51 Cal.App.4th at p. 1161; *Berkemer v. McCarty* (1984) 468 U.S. 420, 442.) The totality of the circumstances surrounding the interrogation must be considered as a whole. (*People v. Boyer* (1989) 48 Cal.3d 247, 272 (*Boyer*).) On appeal, "we accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.' [Citations.]" (*Aguilera* at p. 1161; in accord, *Boyer,* at p. 263.)

The following factors should be considered when determining whether a defendant is in custody during an interrogation: "(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning." (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753; in accord, *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster*).) Additional factors include "whether the suspect agreed to the interview and was informed he or she could terminate

15

the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*Pilster,* at pp. 1403-1404, citing *Aguilera, supra,* 51 Cal.App.4th at p. 1162.)

No one factor is controlling. Rather, we must determine whether on balance the circumstances "created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera, supra,* 51 Cal.App.4th at p. 1162, see *Boyer, supra,* 48 Cal.3d at p. 272.) Applying these standards, we conclude defendant's *Miranda* rights were not violated during his police interview.

## C. Discussion

*Miranda* warnings were not required before or during defendant's police interrogation because defendant was not in custody at the time of the interrogation. Defendant voluntarily agreed to go to the police station and answer questions. Throughout his interview, defendant was told he was not under arrest. Furthermore, after he gave his statement, he was released. Although defendant was interviewed at the police station, "[t]he fact the interrogation actually occurred at the station house is, of course, not dispositive." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1282.) This is because "[n]either detective did or said anything that might cause a reasonable person to believe he was in custody or otherwise deprived of his freedom and, absent that, *Miranda* did not apply." (*Id.* at p. 1283.)

16

The record also does not show that defendant's interrogation was "inherently coercive atmosphere pervading [a] *custodial* interrogation." (*People v. Leach* (1975) 15 Cal.3d 419, 443; *People v. Taylor* (1986) 178 Cal.App.3d 217, 225.) After the infield identification lineups, during which witnesses identified Williams but not defendant, defendant's handcuffs were removed. Defendant was free to leave at this point but voluntarily agreed to go to the police station to be questioned. Defendant was not handcuffed when he was transported to the station. During his interview, he was also not handcuffed.

Although the interview room was locked when defendant was left alone in the room, this was for safety purposes. As explained by Rowe, otherwise defendant would have had free, unsupervised access to the entire police station, since no one was present in the station while Rowe and Brandt were interviewing Williams. Furthermore, defendant could have knocked on his interview room wall or door to get the officers' attention in the event he wanted to leave or had a particular need.

Rowe's statement during defendant's interview, telling defendant that he was not accused of anything, further supports the determination defendant was not in custody. Rowe explained that defendant was being interviewed only for the purpose of finding out what happened during the assault. Even if Rowe actually questioned defendant as a suspect, rather than merely as a witness, *Miranda* warnings were not required simply "because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on

17

the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*People v. Moore* (2011) 51 Cal.4th 386, 402.)

Here, there was no other evidence of restraint and the interviewing officers' comments and questions were not overly aggressive, confrontational, threatening, intimidating, or accusatory. (*Aguilera, supra,* 51 Cal.App.4th at p. 1164.) During defendant's interview, the interviewing officers were cordial and courteous. Rowe became somewhat confrontational on a few occasions, such as when Rowe told defendant he believed defendant was not being totally honest, was giving evasive responses, and was omitting important information. Such comments and questioning as whole, however, did not convert defendant's voluntary presence at his interview into a custodial interrogation. In addition, the officer-witness ratio was only two officers (Rowe and Brandt) to one interviewee during the first part of the interview and just one on one during the second part of defendant's interview.

Although Rowe did not tell defendant he was free to leave, this was apparent from the removal of his handcuffs, Rowe asking defendant if he would voluntarily go to the station to answer questions, defendant remaining unhandcuffed throughout the interview, and Rowe repeatedly telling defendant he was not under arrest. Rowe also told defendant he understood defendant was not physically involved and believed defendant had not hurt anyone. Rowe further explained to defendant that he did not read defendant his *Miranda* rights because Rowe was not accusing him of doing anything. Rather, Rowe was merely trying to find out what had happened.

18

The duration of defendant's detention at the police station (under five hours) was not excessive. Defendant arrived at the police station at around 6:40 a.m., not wearing handcuffs or restrained in any way. He was placed in an interview room, unrestrained. After about an hour and a half, Rowe arrived at the station to interview defendant. At around 8:00 a.m. Rowe and Brandt interviewed defendant for 50 minutes. Defendant was then left alone in the interview room for about two hours, until 10:41 a.m., while Rowe and Brandt interviewed Williams and defendant slept on the floor. Thereafter the second part of defendant's interview commenced. The interview lasted about an additional 20 minutes. Then defendant was released because Rowe believed he did not have sufficient evidence to arrest defendant.

Defendant maintains the trial court abused its discretion by not considering the video recording of the second part of defendant's interview, which was conducted after Rowe interviewed Williams. Defendant argues that, even if he was not in custody for purposes of *Miranda* during the first part of his interview, he was in custody during the second part. The trial court initially stated after a recess in the motion hearing, that the court had just watched videotapes of both the first and second parts of defendant's interview. Defendant argues the court later stated it did not watch the videotape of the second part of defendant's interview. But the court stated this somewhat equivocally three weeks after the hearing on the motion to suppress during the trial. The court remarked, when discussing playing the interview videotapes for the jury, that the court recalled listening to the first segment but not the second part because it was not at issue.

19

The trial court's statement acknowledging it had just watched the video of both parts of defendant's interview is more credible than the court's later statement to the contrary. The former statement was made right after the court watched the interview videotapes. Furthermore, there were transcripts of the interview videotapes, which the trial court may have alternatively reviewed before ruling on defendant's motion to suppress. Under such circumstances, we cannot assume, as defendant does, that the trial court did not consider the second part of defendant's interview when ruling on defendant's motion to suppress.

Furthermore, even if the trial court did not review the videotape or transcript of the second part of defendant's interview, failure to do so does not constitute prejudicial error. The videotapes and transcripts are part of the record on appeal and, when an interview is recorded and the surrounding facts are undisputed, the issue is subject to independent review. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.) Based on the totality of the evidence before this court, we conclude there was substantial evidence that defendant was not in custody when he was interviewed by the police. Therefore the police were not required to advise defendant of his *Miranda* rights before or during his interview. Accordingly, the trial court did not err in denying defendant's motion to suppress statements defendant made during his police interview.

V

DISCLOSURE OF JUROR IDENTIFYING INFORMATION

Defendant contends the trial court violated his due process rights by refusing to disclose TJ11's identifying information. Defendant argues TJ11 did not protest

20

disclosure and therefore the trial court was required to release her identifying information. We disagree.

*A. Procedural Background*

Defendant filed a posttrial motion to disclose juror identifying information under Code of Civil Procedure sections 206 and 237 (disclosure motion). Defendant requested the information for the purpose of investigating whether to bring a motion for new trial based upon juror misconduct. Defense counsel's amended supporting declaration stated that after the trial, he spoke to TJ11 in the courthouse hallway. TJ11 stated she had voted not guilty to count 1, and guilty to counts 2, 3, and 4 because the foreperson and other jurors led her to believe the jury must be unanimous only as to count 1. TJ11 further told defense counsel that on the last day of deliberations, TJ6 "brought in a sheet full of information he had prepared during the evening recess, purportedly consisting of matters he had researched on the internet, and which included Biblical quotations he shared with Juror #11 in order to persuade her."

During the initial hearing on defendant's disclosure motion, the prosecutor agreed, and the trial court found, that defendant had met his burden of making a prima facie showing of good cause for disclosure of the jurors' identifying information. The trial court agreed to draft a letter notifying the jurors that counsel was requesting release of their identifying information. The court told counsel they would have an opportunity to comment on the letter's contents and could make suggestions on changes to the letter.

The trial court sent the jurors a letter dated July 8, 2014, which notified the jurors that counsel had requested their personal juror contact information, that a hearing on the

request was scheduled for July 25, 2014, and that the jurors were requested to notify the court at the hearing or beforehand by phone or letter as to whether they objected or agreed to the granting of the disclosure request. The letter concluded by stating, "If we do not hear from you within 10 days of receipt of this letter, we will try to contact you by phone before the hearing." The letter did not state that if the court did not receive a response, it would assume the juror did not object to disclosure.

During the hearing on July 25, 2016, the trial court noted that one of the jurors, Juror No. 10, was present at the hearing and all of the other jurors, with the exception of TJ11, had responded. Juror No. 10 told the court he did not have any objection to speaking with counsel regarding the trial. After Juror No. 10 left the courtroom, the court stated that the only other juror who consented to speaking to counsel was Juror No. 2. All the other jurors, except for TJ11, sent the court written responses or telephonically told the court they did not want to be contacted. The court stated the court clerk called TJ11 the day before the hearing and the morning of the hearing and left messages but TJ11 did not respond.

Defense counsel argued TJ11's nonresponsiveness meant she did not object to releasing her identifying information and therefore it should be released. The trial court disagreed but deferred ruling on whether to release TJ11's information until the continued sentencing hearing on September 12, 2016. The court said that, in the meantime, the court clerk would continue to try to contact TJ11 by phone. The court stated that it believed that if a juror had not contacted the court in response to the court's

22

letter, the juror did not want to be contacted, but the court would consider any authority to the contrary.

At the hearing on September 12, 2015, the court advised the parties it still had not heard from TJ11. TJ11 was called at least five times. The prosecutor argued that TJ11's nonresponsiveness should be construed as an objection to releasing the juror's identifying information. The prosecutor stated that counsel spoke to the two jurors, Juror No. 2 and Juror No. 10, who agreed to be contacted, and those jurors did not corroborate TJ11's statements made to defense counsel.

After hearing oral argument, the trial court noted that all the jurors, except TJ11, had responded by letter or phone. Some of the jurors had received followup calls. The court noted: "I think that the fact that (TJ11) has certainly received notice from the Court, the letter was not returned – and while no phone messages have been returned, it's clear that her phone is still operational. No one has called back and said it's a wrong number. So clearly she's gotten our requests either by letter or by phone or both. [¶] And the fact that she is refusing to respond leads me to no other conclusion than that she is desirous of not speaking with us, which certainly is her right under the law."

The court added that the two jurors who were contacted did not corroborate any of the comments that TJ11 made in the hallway. There was no corroboration that Juror No. 6 or any other juror said during deliberations that the verdicts did not have to be unanimous. There also was no evidence of any outside influence, such as Juror No. 6 bringing to deliberations Biblical references. The two jurors who spoke to counsel denied that any of those discussions occurred during the juror deliberations. The trial

23

court therefore found there was no credible evidence that any misconduct occurred during the deliberations. The court further found there was not a sufficient basis to subpoena TJ11. In response to the trial court's findings, defense counsel stated he would not bring a motion for new trial.

## B. Applicable Law

After a jury convicts a defendant, defense counsel may attempt to contact jurors to discuss the case with them in an effort to determine whether there was juror misconduct. Jurors often wish to keep their contact information confidential. "'Discovery of juror names, addresses and telephone numbers is a sensitive issue which involves significant, competing public-policy interests.'" (*People v. Tuggles* (2009) 178 Cal.App.4th 1106, 1147 (*Tuggles*), quoting *People v. Rhodes* (1989) 212 Cal.App.3d 541, 548.) "Trial courts have broad discretion to manage these competing interests by allowing, limiting, or denying access to jurors' contact information. [Citations.] The Legislature has supplemented the protection of jurors' personal information by enacting Code of Civil Procedure section 206." (*Tuggles,* at pp. 1147-1148.)

Under Code of Civil Procedure section 206, jurors have the prerogative of agreeing or declining to discuss the case after trial with the parties. "Nothing in section 206 compels a reluctant juror to speak with any of the parties, their counsel, or investigators. 'If any juror refuses to consent, that is the end of the matter.'" (*Tuggles, supra,* 178 Cal.App.4th at p. 1148, quoting *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1097.) If counsel wish to speak to jurors and are unable to locate them, counsel may file a petition under Code of Civil Procedure section 237, seeking access to jurors'

contact information.  Under Code of Civil Procedure section 237, even if there is good cause for disclosure, the petitioner is not automatically entitled to jurors' contact information.  (*Tuggles,* at p. 1149.)  Sections 237 and 206 were enacted "to balance the interests of providing access to records of juror identifying information for a particular, identifiable purpose against the interests in protecting the jurors' privacy, safety, and well-being, as well as the interest in maintaining public confidence and willingness to participate in the jury system." (§ 206, Stats. 1995, ch. 964, § 1; see also *Townsel,* at p. 1091.)

If the trial court sets a hearing on a petition for disclosure of jurors' contact information under Code of Civil Procedure section 237, jurors are entitled to 20 days to object before the hearing.  (Code Civ. Proc., § 237, subd. (c).)  Jurors may object by telephone or in writing, rather than appearing at the hearing.  (*Tuggles, supra,* 178 Cal.App.4th at p. 1149.)  "Regardless of how a juror might object to the release of his or her information, an objection precludes disclosure to the person requesting the information.  [Citations.]  As the California Supreme Court has explained, 'A criminal defendant has neither a guaranty of posttrial access to jurors nor a right to question them about their guilt or penalty verdict.'  [Citations.]" (*Id.* at p. 1149.)  "Nothing in Code of Civil Procedure section 206 or 237 dilutes the trial court's inherent power to shield jurors from unwanted contact by parties or their counsel." (*Id.* at p. 1150; *Townsel, supra,* 20 Cal.4th at p. 1096.)

25

*C. Discussion*

In the instant case, the trial court heard and denied defendant's request for disclosure of TJ11's personal contact information. Defendant contends the trial court erred in denying the request because TJ11 did not "protest" disclosure. Defendant argues TJ11's nonresponsiveness was not a protest within the meaning of Code of Civil Procedure section 237. The People argue to the contrary that TJ11's nonresponsiveness qualified as a protest.

Code of Civil Procedure section 237 does not define the term "protest." Section 237, subdivision (c) states various ways in which a juror may protest a request for disclosure, including appearing in person, in writing, by telephone, or by counsel. But subdivision (c) does not limit a juror's protest to these specified methods. Rather, the statutory language suggests the Legislature intended to accommodate jurors in conveying their objections to disclosure of their personal contact information.

Subdivision (c) of Code of Civil Procedure section 237 therefore did not preclude the trial court from finding in the instant case, based on the totality of the circumstances, that TJ11's nonresponsiveness constituted a "protest" or objection to disclosure under section 237. The disclosure request, notice letter the trial court sent the jurors did not inform TJ11 that if she did not respond to the letter, the court would conclude TJ11 agreed to disclosure and would release her personal contact information to defendant. In addition, after TJ11 failed to respond to the court's letter, the court made at least five follow-up calls over a period of a month and a half, leaving messages requesting TJ11 to notify the court regarding whether she wanted her identifying information released to

26

counsel. TJ11 did not return any of the calls and did not appear in court or contact the court regarding the matter. The trial court continued the hearing on defendant's disclosure request to allow the court clerk to continue attempting to contact TJ11, the only juror who had not responded. The court also verified that the court's notice letter was sent to TJ11's correct address and that calls were made to TJ11's current phone number.

Under these circumstances, the trial court reasonably found that TJ11's nonresponsiveness reflected that TJII objected to disclosure of her personal contact information and was unwilling to be contacted by defendant. Defendant argues that TJ11's silence is insufficient to constitute a "protest" under Code of Civil Procedure section 237, subdivision (d). Defendant's reliance on subdivision (d) for this proposition is misplaced. Subdivision (d) states in part that, "[a]fter the hearing, the records shall be made available as requested in the petition, unless a former juror's protest to the granting of the petition is sustained." This language merely requires the trial court to release a juror's personal contact information, unless the trial court sustains a juror's "protest." Subdivision (d) is not dispositive of the key issue here of whether TJ11's nonresponsiveness can be construed as a protest or objection to disclosure under section 237.

Subdivision (d) of Code of Civil Procedure section 237 further states that "[t]he court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or the juror is unwilling to be

contacted by the petitioner." Here, the trial court reasonably found under the totality of the circumstances that TJ11's nonresponsiveness constituted a passive objection or "protest" to disclosure of her personal contact information and an unwillingness to be contacted by defendant.

We reject defendant's contention that in every instance a juror's nonresponsiveness is not a "protest" under Code of Civil Procedure section 237, and therefore the court must release the juror's personal contact information to the defendant. We also reject the People's contrary proposition that a juror's nonresponsiveness must always be construed as a protest. Whether a juror's nonresponsiveness supports a finding that the juror protests or objects to disclosure of personal contact information under section 237, is a factual determination. In making such a determination, the trial court must consider the totality of the circumstances and this court must give deference to the trial court's findings if supported by the evidence. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931.) Here, there was sufficient evidence to support the trial court's reasonable finding that TJ11's nonresponsiveness demonstrated she objected to disclosure of her personal contact information and did not want to have any contact with defendant. The trial court therefore did not abuse its discretion in denying defendant's request for the release of TJ11's personal contact information.

# VI

## COMPELLING TJ11 TO PROVIDE

## ADDITIONAL INFORMATION

Defendant contends the trial court abused its discretion by not subpoenaing TJ11 to testify regarding her verdicts and serious misconduct she reported to defense counsel. We disagree.

After the trial court denied defendant's request to release TJ11's identifying information, the court discussed whether to subpoena TJ11 regarding juror misconduct that TJ11 had reported to defense counsel. The court concluded there were insufficient grounds for subpoenaing TJ11 because there was no credible evidence of any juror misconduct.

"When allegations of juror misconduct made in a criminal trial raise a presumption of prejudice, the court is not limited, as it would be in a civil case, to consideration of evidence presented by affidavit or declaration to resolve whether a new trial motion should be granted. The court may conduct an evidentiary hearing, at which jurors may testify, to determine the truth of the allegations if the court concludes this is necessary to resolve material, disputed issues of fact." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255 (*Hayes*).) "The hearing should not be used as a 'fishing expedition' to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 (*Hedgecock*).)

Here, the trial court did not abuse its discretion in not subpoenaing TJ11 because there was insufficient evidence "demonstrating a strong possibility that prejudicial misconduct has occurred." (*Hedgecock, supra,* 51 Cal.3d at p. 419.) The only evidence submitted by defendant to show juror misconduct was defense counsel's declaration stating his conversation with TJ11 in the hallway, during which TJ11 reported what other jurors had said during deliberations. These statements in defense counsel's declaration constitute inadmissible double hearsay under Evidence Code section 1200. The statements consist of defense counsel stating what TJ11 had told him that other jurors had said and done during jury deliberations. This inadmissible double hearsay is insufficient to trigger the court's duty to subpoena TJ11 to testify regarding juror misconduct. (*Hayes, supra,* 21 Cal.4th at p. 1255.)

Furthermore, the double hearsay contained in defense counsel's declaration is inadmissible under Evidence code section 1150, subdivision (a), which provides: "Upon an inquiry as to the validity of a verdict, any otherwise *admissible evidence* may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.*" (Italics added.) In other words, "when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes.

30

Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*Hedgecock, supra,* 51 Cal.3d at p. 419.)

In addition, juror comments made during the deliberations regarding verdict unanimity do not constitute juror misconduct but rather, at most, indicate confusion or misunderstanding of the law. In the instant case, the court properly instructed the jury on unanimity. The court instructed the jury: "Your verdict on each count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree on it." (CALCRIM No. 3550.) The court also properly instructed the jury regarding unanimity as to the theories of aiding and abetting, and conspiracy. (CALCRIM Nos. 409, 416.) It is presumed that the jury understood and followed the trial court's instructions and performed its duty properly. (*People v. Jackson* (2014) 58 Cal.4th 724, 767.) Defendant did not provide the trial court with any admissible evidence to the contrary.

In addition to there being no admissible evidence of juror misconduct, there was evidence supporting a reasonable finding that no juror misconduct had occurred. The trial court polled the jury and each of the jurors individually stated that the verdicts as to each count reflected their own verdicts. This demonstrated that the verdicts were unanimous. Additional evidence refuting TJ11's reported claim of misconduct included statements by two jurors, Juror No. 2 and Juror No. 10, who informed the court that the juror misconduct TJ11 had reported did not occur.

Where there was no admissible evidence establishing juror misconduct, and there was admissible evidence to the contrary, the trial court did not abuse its discretion in not

31

compelling TJ11 to testify. The court was not required to subpoena TJ11 because the defense did not come forward with admissible evidence "demonstrating a strong possibility that prejudicial misconduct has occurred." (*Hedgecock, supra,* 51 Cal. 3d at p. 419.)

## VII

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

CODRINGTON _____
                                                    J.

We concur:

MILLER _____
          Acting P. J.

SLOUGH _____
                    J.